Mark A. DIENER, Stephen Garisto, Jim Grove, Pearl Grove, Jeff Mayon, Lee Smith, Jason Storms, Sheri Sucec, and John K. Young, Plaintiffs,

v.

Stephen R. REED, in his official capacity as Mayor of the City of Harrisburg, Defendant.

Civil Action No. 1:CV–02–0977.

United States District Court, M.D. Pennsylvania.

Dec. 2, 2002.

Leonard G. Brown, Randall L. Wenger, Clymer & Musser, P.C., Lancaster, PA, for Plaintiffs.

Frank J. Lavery, Jr., Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, for Defendant.

## *MEMORANDUM*

CALDWELL, District Judge.

## I. *Introduction.*

We are considering Plaintiffs' request for permanent injunctive relief. Plaintiffs, a group of street preachers and protesters, were either arrested or threatened with arrest at events in the City of Harrisburg, Pennsylvania, mostly on charges of disorderly conduct. They filed a complaint pursuant to 42 U.S.C. § 1983, asserting that their First Amendment rights had been violated. They named as defendant, Stephen R. Reed, the Mayor of Harrisburg, in his official capacity. The complaint seeks injunctive and declaratory relief and nominal and compensatory damages.

The complaint's First Amendment claims can be broken down into two groups. One group alleges that the Harrisburg police department applies Pennsylvania's disorderly conduct statute to Plaintiffs as a way of suppressing their First

Amendment activities. The second group alleges facial and as-applied challenges to the permit system governing the use of city parkland for First Amendment activities as well as for group recreational and other purposes.

The part of the case challenging the permit system is somewhat unusual. Plaintiffs themselves have never applied for a permit to use city parkland, and apparently limit their own First Amendment activity to protesting and preaching at events the city has permitted others to hold. In spite of this, they make First Amendment arguments against the permit system that would be expected to be made by those whose group activity would be subject to the law. Nonetheless, under First Amendment standing law, they are entitled to present these arguments.

The complaint was accompanied by a motion for a temporary restraining order (TRO). On July 26, 2002, upon agreement of the parties, a TRO was entered.[1] On August 15, 2002, a hearing was held on Plaintiff's motion for a preliminary injunction. Following the hearing, the parties agreed that a decision on the merits of a permanent injunction could be made based on the evidence produced at the hearing.[2]

1. In part, the TRO restrained Defendant from interfering with Plaintiffs' activities outside Harrisburg's July 2002 Gay Pride Festival as long as Plaintiffs stayed out of the area designated for the festival, allowed others to enter or exit the festival, and acted in a way consistent with Pennsylvania's disorderly conduct statute. The TRO also permitted Defendant to enforce Pennsylvania law "in a constitutionally permissible manner."

2. See Fed.R.Civ.P. 65(a)(2), which provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

## II. Background

### A. The Harrisburg Permit System Governing Use of Public Parkland.

Harrisburg has a permit system for the use of city parkland that broadly covers uses for recreational, political or other purposes, codified in nine sections of the City of Harrisburg Codified Ordinances at Chapter 10–301, located in §§ 10–301.20 through 10–301.26 and §§ 10–301.29 and 10–301.30, as amended by Ordinance No. 14–2001, signed into law on October 24, 2001. Plaintiffs challenge five of these sections. We set forth the provisions of the challenged sections as follows.

Under section 10–301.21, a person must apply to the city's Director of the Department of Parks and Recreation (the "Park Director" or "Director") for a permit. Under section 10–301.20(A)(1), groups of twenty or more persons intending to use parkland for public speeches or other purposes must obtain a permit.[3] Under section 10–301.23(A)(1), a somewhat overlapping provision, any person or group of persons (regardless of the group's size) intending to distribute literature or make public speeches in city parks must obtain a permit.[4]

3. Section 10–301.20(A), captioned "Organization/Family/ Group Park Permit," provides in subsection (1) as follows, in pertinent part:

No person shall engage in, participate in, aid, form or organize any assembly or group of twenty or more persons, or make any public speeches in which twenty or more persons are intended to, or may be anticipated to, participate or do participate in, any park and require a reserved space or will occupy a portion of a park to the exclusion of others unless a permit therefor has been obtained from the Director . . . .

4. Section 10–301.23(A), captioned "Public Speech and Literature Distribution Park Permit," provides in subsection (1) as follows, in pertinent part:

For a permit application under section 10–301.20(A)(1), the Park Director must decide within three business days whether to grant or deny it. *See* § 10–301.20(A)(2). If the Director decides to grant the permit, she is authorized to include "such reasonable conditions as [she] deem[s] appropriate . . . ." If she denies it, she must state in writing the reasons for the denial. *Id.*

For a permit application under section 10–301.23(A)(1), the Park Director must generally decide within twenty-four hours of the application whether to grant it. *See* § 10–301.23(A)(2). If the permit is granted, the Director is authorized to include "such reasonable conditions as [she] deem[s] appropriate . . . ." If it is denied, the Director must state the reasons for the denial. *Id.* For applications submitted under section 10–301.23(A)(1) before noon on Friday or before noon of a day preceding a holiday, the application will be acted on before the close of business that day. *See* § 10–301.23(A)(2).

Under either section, if the permit is denied, there is a right to appeal to the mayor within ten days, who must decide the appeal within five days. *See* §§ 10–301.20(A)(2) and 10–301.23(A)(2). If he does not act, "he is deemed to have sustained the appeal and the permit shall be issued." *Id.* The ordinance is silent about any right to judicial review of a mayoral denial of an appeal. The Park Director can revoke a permit for violation of a rule, ordinance, or "for good cause shown." *See* § 10–310.26.

Section 10–301.22 provides the standards for the Park Director's issuance of a permit under both section 10–301.20(A)(1) and section 10–301.23(A)(1). They are also the standards the Mayor is to use in decid-

ing an appeal. *See* §§ 10–301.20(A)(2) and 10–301.23(A)(2). Under section 10–301.22(A):

The Director shall issue a permit hereunder after making the following findings:

(A) that the proposed activity or use of the park will not unreasonably interfere with or detract from the general public enjoyment of the park;

(B) that the proposed activity and use will not unreasonably interfere with or detract from the promotion of public health, welfare, safety and recreation;

(C) that the proposed activity or use is not specifically intended to result in violence, crime or disorderly conduct;

(D) that the proposed activity will not entail unusual, extraordinary or burdensome expense to the City;

(E) that the facilities desired have not been reserved for other use at the day and hour required in the application.

The city also controls the distribution of literature in certain areas of its parkland. Literature may not be distributed in any parkland, including Reservoir Park, Riverfront Park, Italian Lake, and City Island in "those areas for which permits have been previously issued for a private or public event." *See* section 10.301.29(A)(1), (B), (C), (D)(1). Literature may not be distributed in Reservoir Park, "in those areas occupied by the National Civil War Museum and the fields, lawns, and park areas adjacent to the Museum and under its control." *See* section 10.301.29(A)(2). Literature may not be distributed on City Island "in those areas occupied by leaseholders and park areas under leaseholders (sic) control." *See* section 10.301.29(D)(2). Otherwise, literature may be distributed in

No person or group of individuals shall engage in, participate in, aid, form or organize the distribution of literature or make

any public speeches within any City park unless a permit therefor has been obtained, without fee, . . . .

these and any other areas of the city parks. *See* section 10.301.29(E).

Section 10–301.30 also regulates leafleting. It provides that leafleteers: (1) shall not block the entrance or exit for any park or commercial business or any commercial activity; and (2) "shall stand on the grass off the walkways and shall keep moving when they are on the walkways so that they shall not block or otherwise impede public use and enjoyment of the walkways . . . ."[5]

At the injunction hearing, Tina Manoogian–King, the Park Director, testified about the city's administration of the permit system. The system provides orderly use of the parkland for the some two million people who use the parks annually. (Tr. 112).[6] There are "'multiple activities' . . . occurring . . . almost simultaneously" and they are "coordinate[d] through the permit process." (Tr. 113). Permits are good for one day. (Tr. 116). The process ensures that permit holders can hold their events without disruption and for their exclusive use. (Tr. 135). As the Park Director testified, permits are even issued for weddings, and "[i]f you are holding a wedding, you don't necessarily want someone else to come in and disrupt your wedding." (Tr. 135). Permits are granted at the start of the calendar year, so a line appears at her office on January 2 for those wishing to secure a particular date, time and location; it is first come, first served. (Tr. 110–11).

Manoogian–King uses the criteria in section 10–301.22 in issuing permits. (Tr. 108–09). No other considerations or discretionary factors enter into the decision. (Tr. 110). She has denied permits in the past but only because the area sought had already been permitted to another group. (Tr. 110). She has never denied a permit on the basis of the type of group requesting it or the content of its message. (Tr. 122).

She issues between 500 and 700 permits a year. (Tr. 112). Some permits are for group events like the 2001 Gay Pride Festival (Tr. 117), but if a family wants to use a pavilion for a family event for twenty or more persons, they must apply for a permit. (Tr. 121). The application requests information so that the city can determine the group's need for sanitation, electricity, space, traffic control and law enforcement. (Tr. 117, 119, 120).

In addition to short-term park permits, the city leases areas in its parks under long-term leases for educational, recreational and historical purposes. One example is the National Civil War Museum, which the city built in Reservoir Park. The city has leased the museum and surrounding grounds for thirty years to a nonprofit corporation, called "The National Civil War Museum." (Defendant's exhibit 5; Tr. 154). Under the lease, the corporation controls the museum and grounds and operates the museum to preserve Civil War material, culture and sources of informa-

---

**5.** In pertinent part, section 10–301.30 provides as follows:

> In no event shall anyone distributing literature block ingress or egress to any Park or any commercial business or other commercial activity. Further, those distributing literature shall stand on the grass off the walkways and shall keep moving when they are on the walkways so that they will not block or otherwise impede public use and enjoyment of the walkways for activities such as jogging, bicycling, roller blad-

ing or any other activity. "Blocking" shall mean "obstruction or otherwise hindering a movement of other persons or vehicles lawfully exercising their rights to utilize the walkways, driveways, parking lots or to have access to any park or any commercial businesses or activities or other activities therein."

**6.** "Tr." references are to the hearing transcript (doc. 16).

tion, to offer the general public educational exhibits and programs and to act as a source of research and reference on the Civil War era, defined as the period between 1845 and 1870. (Defendant's exhibits 4 and 5).

George E. Hicks, the museum's chief executive officer, described the museum's grounds, using an architect's drawing (Defendant's exhibit 7). There is a memorial walkway to commemorate the Civil War dead, a large rectangular area for living-history encampments, and a parking lot for 250 cars. (Tr. 153). In addition, there is parking for buses and recreational vehicles and some 65,000 square feet of Reservoir Park either leased, or subject to a license, for the use of the corporation. (Defendant's exhibit 5 at p. 1).

There are also commercial facilities on City Island which are operated under long-term leases for recreational purposes. Manoogian–King listed them as "the batting cages and arcade area," the "water golf area," a "train station" and "a carousel," "Riverside Village Park," and the "Harrisburg Senators Baseball Stadium." (Tr. 106).

The Park Director testified that the City does not allow persons to distribute literature in areas subject to long-term leases or already subject to a permit for another group or individual. (Tr. 104). For example, if "the Gay Pride group" wanted to distribute literature in an area already permitted to another group for a group baptism, the former would be prohibited from doing do. (Tr. 123). In those circumstances, as she has done in the past, the Park Director would work with the group seeking to distribute literature and try to set them up in a location in close proximity to the permitted group. (Tr. 124).

Plaintiffs have never applied for a permit for use of a park area. When asked if she would deny a permit if Plaintiffs requested one for an area adjoining an event for gays and lesbians so that Plaintiffs could protest the event, Manoogian–King at first hesitated, and then said she would grant the permit. (Tr. 141–42).

The permit holder is given the discretion to decide who is allowed into the permitted area for leafleting, handing out pamphlets "or anything else of that nature." (Tr. 136). Permit holders "have the right to approve or deny whoever comes in under their permit. That includes vendors or entertainers. It could involve concessions or arts and craft items that people want to sell. They can deny it for a whole multitude of reasons." (Tr. 137). Thus, as the Park Director testified, the permit holder for a gay-pride event can exclude pamphleteers on the basis of the contents of their pamphlets. (Tr. 137–38). The protesters may be excluded even if they wanted to attend as mere spectators. (Tr. 137).

Persons are not allowed to block the entrances or exits of long-term leased areas to preserve the right to operate these businesses and the right of customers to use them. (Tr. 108). There are alternative areas in Reservoir Park and City Island for people to pass out literature other than leased areas, areas that allow contact with people entering the leased areas. (Tr. 106–07).

If a person desired a permit under section 10–301.23(A)(1) after noon on a Friday to distribute literature on a weekend, there does not appear to be any way to apply for one in time for it to be granted. The Park Director has twenty-four hours to grant it, *see* section 10–301.23(A)(2), and she testified that city offices are closed on the weekends. (Tr. 143–44).

B. *The As–Applied Challenge to the Disorderly Conduct Citations.*

Plaintiffs are street preachers. (Tr. 8, 14). They preach the Gospel of Jesus

Christ in public places to anyone who will listen. (Tr. 9). Some listeners mock but others are changed. (Tr. 9). As shown below, Plaintiffs also hand out Bible tracts and display signs expressing their beliefs. Among those beliefs is their conviction that engaging in homosexual activity is morally wrong.

Based on their activities, Plaintiffs and their associates have been arrested or threatened with arrest at seven events in the City of Harrisburg, mostly on charges of disorderly conduct. Four of these events were for gays and lesbians. We describe the circumstances of Plaintiffs' encounters with the police as follows.

1. *The June 9, 2000, Encounter at the National Civil War Museum.*

Plaintiff Sheri Sucec testified that she was upset after reading that Mayor Reed had signed a proclamation which she interpreted as announcing the contributions of gay citizens to the community. (Tr. 12). To protest the proclamation, on the evening of June 9, 2000, Sucec and plaintiff Jeff Mayon went to the National Civil War Museum, then under construction in Reservoir Park, a public park in Harrisburg.[7] (Tr. 41). The city was holding a ceremony at the site of the museum at that time to honor the Civil War dead.

Sucec and Mayon protested by carrying signs which read "Proof That America Condones Sodomy" and "Blessed Is the Nation Whose God is the Lord." (Tr. 41–42). They testified that they sang hymns, distributed literature regarding the Mayor's proclamation and spoke with people who were passing by. (Tr. 20). However, while the ceremony was going on, they simply watched and listened. (Tr. 20). After the ceremony concluded, Sucec and Mayon said that the Mayor approached them and "exploded" after they gave him the proclamation he had issued. (Tr. 43). Before then, the Mayor did not seem to understand what they were doing there. (Tr. 43). The Mayor was angry and, while speaking, unintentionally spit in the face of one of them. (Tr. 14). They said the Mayor directed them to leave the park, but as they were complying by walking to their car, they were arrested and taken to city hall. (Tr. 43–44).

Contrasting testimony was offered by George Hicks, the museum's chief executive officer, who testified that after the ceremony concluded, Sucec and Mayon "were moving towards the podium area up against where the building was located and shouting and protesting and saying all kinds of things." (Tr. 157). Hicks told his wife to "get to the car, get out of here now." (Tr. 158). Sucec kept moving toward him and Mayon toward the Mayor. (Tr. 159–60). As Sucec moved closer, she was "shouting religious things," "haranguing and shouting in [his] face [until] she was literally within arm's length." (Tr. 159–60). Police officers and park rangers were called to the area. (Tr. 164).

Park ranger Thomas McDowell testified that after the ceremony, the Mayor had asked Sucec and Mayon to "please leave." (Tr. 176). McDowell testified that Sucec was very loud and telling the Mayor he was killing people. (Tr. 176–77). The Mayor backed away and they kept coming forward. (Tr. 177). McDowell was concerned for the Mayor's safety. (Tr. 177).

According to Mayon, the four persons there that night were charged with disorderly conduct under 18 Pa.C.S. § 5503. (Tr. 43). Mayon's and Sucec's citations

---

7. Joe Murgie and Bill Murray were with Sucec and Mayon, but are not plaintiffs. (Tr. 47).

indicate they were charged under section 5503(a)(1).[8] However, neither the Mayor nor the police officers (except for a corporal) attended the hearing. (Tr. 44). Plaintiffs were found not guilty by the district justice. (Tr. 16). According to Plaintiffs' complaint, the charges were dismissed because the Mayor was not present at the hearing. (Tr. 34).

### 2. *The July 29, 2000, Encounter at Gay Pride Day in Harrisburg.*

The Harrisburg Gay Pride Day was held on July 29, 2000. (Tr. 11). Plaintiffs Stephen Garisto and Sheri Sucec were present, but outside the boundaries of the event. Garisto testified that he was evangelizing, passing out tracts and talking to passersby. (Tr. 89). He also said he attempted to enter the event but was denied admission. (Tr. 89). Harrisburg police officer Tanya Taylor cited him for disorderly conduct under 18 Pa.C.S. § 5503(a)(2) and (4).[9] The citation appears to charge him with attempting to push pass the officer into the event despite repeated warnings not to do so. (Plaintiffs' exhibit 4). According to him, she told him he could not be there, preaching and passing out tracts, and that he had to be 500 feet from the event.[10]

Manoogian–King, the Park Director, testified that she observed Garisto "screaming his beliefs and spewing his rhetoric" through a megaphone. (Tr. 127). She also testified that she saw him grab a person by the arm and waive a Bible in that person's face, again "spewing his rhetoric." (Tr. 127). Garisto invaded her "personal space" as well, about a foot from her face, screaming that she was "destroying the moral fibre of Harrisburg" by allowing the event to take place. (Tr. 127–28). According to her, Garisto was "out of control running around, screaming and yelling," (Tr. 128), although she said she never had a problem with the words he was using, just his conduct. (Tr. 128).

The Director also said she saw Garisto and others attempt to block the street entrance to the event. (Tr. 129). When the police advised the group not to block the area, the group would return to the sidewalks or a traffic island, (Tr. 129), but after the officers turned their backs, Garisto and others "would step back onto the street almost in a manner that was taunting to the Police." (Tr. 129).

Garisto felt that his First Amendment rights were violated when the police told him he could not preach or pass out tracts while standing in the street. (Tr. 90). No police officer told him why he was being cited. The charge was dismissed at the hearing; no officer appeared. (Tr. 90).

---

**8.** Section 5503(a)(1) provides that a "person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he (1) engages in fighting or threatening, or in violent or tumultuous behavior ..."

**9.** Sections 5503(a)(2) and (4) provide, respectively, that a "person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... (2) makes unreasonable noise" or "(4) creates a hazardous or physically offensive condition by any act that serves no legitimate purpose of the actor."

**10.** Sheri Sucec videotaped Garisto's arrest. On the portion of the videotape Plaintiffs played during the hearing, Officer Taylor advises Garisto that he must move 500 feet back from the area. (Tr. 139). Harrisburg Police Chief Charles Kellar testified that there was no city ordinance or police order which required Garisto to be 500 feet back from the Gay Pride Festival on July 29, 2000. (Tr. 222). Both Manoogian–King and Kellar testified that the 500 foot rule applies only to itinerant street vendors. (Tr. 138, 222).

### 3. *The October 7, 2000, Encounter at the Harrisburg Gaytober Fest.*

Plaintiffs Sheri Sucec and John Young attended the Gaytober event on October 7, 2000, around the area of Third and North Streets in Harrisburg. (Tr. 19, 201). At the hearing, Plaintiffs played an edited videotape of their preaching and interacting with police officers. (Tr. 11). Sucec testified that the roads were blocked by barricades for the event. (Tr. 11). Sucec also stated that she assumed the organizers of the Gaytober event had a permit because the streets were closed to vehicular traffic. (Tr. 19).

Harrisburg police officer Brenda Holmes testified that she was on duty at this event. (Tr. 200). Holmes stated that the Gaytober organizers had a permit and that all vendors inside the event were charged a fee to operate their booths. (Tr. 201). Holmes observed plaintiff Young with a handheld tape recorder which he put "in front of people's mouths, like two or three inches from their face." (Tr. 202). She also observed Sucec and Young videotaping people. Throughout the day of the event, Holmes repeatedly warned the plaintiffs to cease this behavior. (Tr. 203). The organizers of the event complained about the behavior and wanted it stopped. (Tr. 203). At first, Holmes permitted Young to pass out literature within the festival, but then she prohibited it because the organizers complained that vendors had paid a fee for spots inside the festival and Young had not. (Tr. 205).

Holmes warned the plaintiffs to stop putting the tape recorder in people's faces and to stop distributing brochures inside the event. (Tr. 205). She testified that Young refused. (Tr. 205). After numerous warnings, he was arrested and charged with disturbing the peace, a violation of a Harrisburg city ordinance. (Tr. 206).

A hearing was held before a district justice where event organizers testified against Young. The district justice found him guilty. (Tr. 207). According to Sheri Sucec, the district justice said that the guilty verdict was based on Young's having put the tape recorder into people's faces. (Tr. 33).

### 4. *The February 8, 2001, Encounter at the Private Opening of the National Civil War Museum.*

On February 8, 2001, an event was held at the National Civil War Museum by invitation only. (Tr. 165). It was a private celebration for a group of people, before the museum's official opening, such as contractors, friends and supporters. (Tr. 165). Plaintiffs Sheri and Michael Sucec, not knowing it was a private event, appeared at the museum uninvited. (Tr. 72). After being told they had to leave, they drove down to the entrance to Reservoir Park and stood in the park near the street. (Tr. 72). They did not preach but Michael Sucec held his Bible up and Sheri Sucec displayed a sign that read "Blessed Is the Nation Whose God is the Lord."

According to Harrisburg Police Officer Steven Novacek, Reservoir Park was closed to the public because of the invitation-only event, (Tr. 186), as well as for security reasons. (Tr. 184). He testified that he therefore asked Sheri Sucec to leave the park, perhaps telling her that she could stand on the nearby street. (Tr. 187). According to Michael Sucec, Novacek threatened to arrest them if they did not leave. (Tr. 74). At that point, the Sucecs left the park. (Tr. 74).

### 5. *The February 12, 2001, Encounter at the Public Opening of the National Civil War Museum.*

The Civil War Museum had its grand opening on February 12, 2001. The event

was open to the public. (Tr. 166–67). Michael and Sheri Sucec drove to the museum and parked there. Sheri Sucec held up her sign reading "Blessed Is the Nation Whose God is the Lord." They offered tracts to people, and Michael Sucec started to preach. (Tr. 74). According to Michael Sucec, museum director Hicks told them to leave because he had a permit, and they were not allowed to be there. (Tr. 75). According to Hicks, Sheri Sucec then approached the invited guests, asking them in a somewhat threatening voice if they had a permit to be there. (Tr. 168). The Sucecs left without being charged; in their words, they were "escorted" to their vehicle. (Tr. 75).

### 6. The July 28, 2001, Encounter at Gay Pride Day in Harrisburg.

A Gay Pride Day was held in Harrisburg on July 28, 2001. The event was held in Harrisburg's Riverfront Park. Plaintiff Jason Storms testified that their group was preaching across the street from the park on the sidewalk. (Tr. 56). Storms testified that they began to preach only with their voices and later they used a megaphone. (Tr. 57). Along with preaching, they displayed signs and sang hymns. (Tr. 57).

Storms stated that plaintiff Mark Diener was playing a snare drum periodically during the day. (Tr. 58). Then Diener was arrested without warning. (Tr. 58). Then Lee Smith, another of their group, was arrested, and then Storms. Storms was charged with disorderly conduct for using a megaphone. (Tr. 59). According to Storms, he and Smith were both found guilty that night and fined $141 each. He paid the fine but for some unknown reason it was later returned to him. (Tr. 60, 61). Smith appeared for a later court date, but

the charges against him were dismissed when no one appeared to prosecute the case. (Tr. 61).

Harrisburg Police Sergeant Ellis Roy was the officer in charge during the festival and reported for duty at 11:00 a.m. (Tr. 210). He testified that things went well with the protesters for most of the day. (Tr. 211). However, around three-thirty or four in the afternoon, there was a "breakdown." (Tr. 211). Instead of generalized protest, the street preachers began to use the megaphone to direct comments at particular individuals at the festival. (Tr. 212). Sgt. Roy did not want a fight to break out between the protesters and those being singled out over the megaphone. (Tr. 212).

Roy also stated that the police received a complaint about the drum beating from a resident of a building near where the protesters were preaching. (Tr. 213). Roy informed Diener that he could no longer use the drum because the police had received a complaint. (Tr. 213). Roy testified that Diener told him that the complaint was probably about the music coming from the festival. (Tr. 213). Roy replied that the festival had a permit for the music and the complaint was specifically about the drum beating. (Tr. 213). Roy warned Diener several times to stop beating the drum and felt that they "had a meeting of the minds." (Tr. 215). But Diener continued to beat the drum, and Roy charged him with disorderly conduct under 18 Pa.C.S. § 5503(a)(4).[11] (Tr. 215–16). The citation refers to the use of the snare drum. (Plaintiffs' exhibit 5).

Roy also testified that while Diener was being arrested, two other protesters began to yell at the officers through the megaphone. (Tr. 216). These individuals (un-

---

**11.** Section 5503(a)(4) involves the "creat[ion of] a hazardous or physically offensive condi-

tion by any act that serves no legitimate purpose of the actor."

doubtedly Storms and Smith) were arrested and charged with disorderly conduct. (Tr. 216–17).

### 7. *The July 27, 2002, Encounter at Gay Pride Day in Harrisburg.*

Several of the plaintiffs attended the Gay Pride Festival on July 27, 2002, to preach and protest. Plaintiff Garisto observed people "being prohibited from speaking and preaching" at that event. (Tr. 91). Plaintiff Sheri Sucec saw a man reading from the Bible in a normal tone of voice outside the entrance of the event, but three police officers told him he had to go to the street or across the street. (Tr. 19).

In contrast, Jennifer Ellis, a volunteer worker at the event, testified that she observed several of the protesters "shouting and heckling people, harassing people, getting in people's faces and saying derogatory comments, calling people names, causing a great deal of disruption and making so much noise that at times it was interfering with the performers on the stage." (Tr. 192).

### III. *Applicable Law.*

### A. *Injunctive Relief.*

■ Permanent injunctive relief can be granted if the following three conditions are satisfied:

First, the plaintiff must demonstrate that the court's exercise of equity jurisdiction is proper. Second, the plaintiff must actually succeed on the merits of [his or her] claims. Third, the plaintiff must show that the balance of equities tips in favor of injunctive relief.

*Roe v. Operation Rescue,* 919 F.2d 857, 867 n. 8 (3d Cir.1990) (quoting *Northeast Women's Center, Inc. v. McMonagle,* 665

F.Supp. 1147, 1152–53 (E.D.Pa.1987)). The first condition has three subparts: "(1) [there is] no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3) no equitable defenses exist." *Roe,* 919 F.2d at 867 n. 8 (citing *Northeast Women's Center,* 665 F.Supp. at 1153).

### B. *First Amendment Law.*

■ The First Amendment protects speech and other expressive activity in public places, or "government fora," and the degree of protection depends upon the type of forum at issue. *See Kreimer v. Bureau of Police,* 958 F.2d 1242, 1255–56 (3d Cir.1992). The Supreme Court has identified three types of fora. *See Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875, 886 (1998). First, there are traditional public fora, the streets, parks and public sidewalks long considered as places for public assembly and the communication of ideas. *Kreimer,* 958 F.2d at 1261. Second, there are designated public fora, areas the government has specified for First Amendment activities. Included in this group are "limited public fora," property designated by the government for the exercise of some forms of First Amendment activity, but not all. *Id.* Third, there are nonpublic fora, places "which are not 'by tradition or designation [fora] for public communication ....' " *Id.* at 1255–56 (brackets in original) (quoted case omitted).[12] The third group is the government equivalent of private property. *Id.* at 1256.

■ For traditional fora and designated fora, government regulation of First Amendment activities is subject to higher judicial scrutiny than regulation in nonpublic fora. *Id.* In these fora, regulation

---

**12.** And sometimes government property is not a forum at all. *Id.* at 678, 118 S.Ct. at 1641, 140 L.Ed.2d at 887.

of First Amendment activity is constitutional if three conditions are met. First, the regulation must be content-neutral, that is, "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661, 675 (1989)(quoted case omitted). Second, it must be "narrowly tailored to serve a significant governmental interest." *Id.*, 109 S.Ct. at 2753, 105 L.Ed.2d at 675 (quoted case omitted). Third, it must "leave open ample alternative channels for communication of the information." *Id.*, 109 S.Ct. at 2753, 105 L.Ed.2d at 675 (quoted case and other citations omitted).

■ The same standard applies to regulation in the subset of designated public fora known as limited public fora for First Amendment activities either permitted in that fora or consistent with permitted activities. *Kreimer, supra*, 958 F.2d at 1262. Otherwise, regulation of First Amendment activities in limited public fora and nonpublic fora need only be reasonable and not an effort to suppress communication based on the speaker's view. *Id.* at 1256, 1262; *see also Hotel Employees & Restaurant Employees Union v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 553–54 (2d Cir.2002) (reasonableness standard applies to both limited public forum and nonpublic forum).

## IV. *Discussion*

### A. *The First Amendment Challenge to the Harrisburg Permit System.*

■ Initially, we conclude that Plaintiffs have satisfied the first requirement for permanent injunctive relief. Our exercise of equity jurisdiction is proper here because, taking the criteria from *Roe, supra*, in reverse order, Defendant presents no equitable defenses, the threatened injury is real for First Amendment purposes,[13] and, most importantly, there is no adequate legal remedy since the loss of First Amendment freedoms, even for a minimal period of time, constitutes irreparable injury, *see Swartzwelder v. McNeilly*, 297 F.3d 228, 241 (3d Cir.2002); *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.1989), and unconstitutional suppression of speech represents such an injury. *See Dombrowski v. Pfister*, 380 U.S. 479, 485–86, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22, 28 (1965); *Hohe*, 868 F.2d at 73.

■ We turn now to the merits of the First Amendment claims. We note that Plaintiffs' challenge is phrased and argued simply as one against the "Ordinance" in general, not to individual provisions or to provisions that are necessarily related for the purpose of the permit system. We reject this shotgun approach and will examine the provisions individually for the constitutional challenge, along with others that are necessarily related. *See Gannett Satellite Info. Network, Inc. v. Berger*, 894 F.2d 61, 66 (3d Cir.1990)(a First Amendment challenge that "conflates four distinct regulatory elements into an amorphous whole ... needlessly obscures the first amendment issues" and the court would instead "subject each component ... to independent constitutional scrutiny.").[14]

---

**13.** While Plaintiffs have never applied for a permit under sections 10–301.20(A)(1) and 10–301.23(A)(1), the law of standing for First Amendment cases, as discussed below in note 16, authorizes them to pursue these claims.

**14.** We note in passing a defense argument concerning the forum status of permitted ar-

eas. Defendant contends that when the city grants a permit, the permitted area becomes either a limited public forum or a nonpublic forum since the permit in effect designates the area for a specific use or for a limited class of people. Our resolution of this case does not require us to address this argument. However, we disagree with it, believing the

1. *Plaintiffs' Challenge to Section 10–301.22's Standards For Granting a Permit and to the Supposed Absence of Essential Procedural Safeguards for Review of the Park Director's Decision.*

 Plaintiffs make a facial challenge to the standards in section 10–301.22 ("section 22") that govern the Park Director's grant of a permit under section 10–301.20(A)(1)("section 20(A)(1)"), the provision applying to groups of twenty or more persons who want to use city parks.[15] They also make a facial challenge to the absence, as they view it, of essential procedure safeguards for review of her decision.[16]

Specifically, Plaintiffs argue that under *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), section 22 confers too much discretion on the Park Director in deciding whether to grant a permit. Additionally, they maintain there is no provision for prompt judicial review, as required by *Thomas v. Chicago Park District*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), and *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Indeed, they argue there is no provision at all for judicial review.

As noted, sections 20(A)(1) and 23(A)(1) require a permit from the Park Director. In deciding whether to grant either kind of permit, the Park Director must use criteria set forth in section 22. The criteria are that the proposed activity or use: "will not unreasonably interfere with or detract from the general public enjoyment of the park"; "will·not unreasonably interfere

---

Mayor's reliance on *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), to support it is misplaced and that the city cannot transform a traditional public forum into a limited public forum simply by issuing a short-term permit. *See Schwitzgebel v. City of Strongsville*, 898 F.Supp. 1208, 1216 (N.D.Ohio 1995) ("so simple an exercise as the granting of a permit" should not allow the government, in effect, to suspend the existence, even temporarily, of so important a forum for First Amendment rights as the traditional public forum).

Our conclusion also applies to Defendant's unelaborated position that a permit transforms the city's parkland into a nonpublic forum. We also add that we see no benefit to Defendant if a permitted area was considered to be a limited public forum since Plaintiff's activities would be consistent with other authorized First Amendment activities and hence the city's rules would be subject to the same scrutiny as if a traditional public forum was involved. *See Kreimer, supra,* 958 F.2d at 1262.

**15.** Section 22's standards also apply to the grant of a permit under section 10–301.23(A)(1), the provision applying to any person or group who want to distribute literature or make speeches in the parks.

**16.** These are facial challenges because Plaintiffs have never applied for a permit to use the city parks (and indeed appear not inclined to do so since their own activities seem to consist solely of protesting at events held by others). Nonetheless, Plaintiffs have standing to challenge these provisions because of the First Amendment exception to the normal rule of standing that allows a person to challenge a law that allegedly vests overly broad authority in a government official to license First Amendment activities, whether or not her own activities would be illegal under a properly drawn statute or whether she had applied for a license. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771, 781–82 (1988); *Gannett Satellite Info. Network, supra,* 894 F.2d at 65–66 ("for overbroad statutes affecting speech ... it is necessary to allow facial challenges ... irrespective of the plaintiff's particular injury."). Although Plaintiffs may not succeed on the merits, the Supreme Court's two-part test for allowing a facial challenge is satisfied here. *See United States v. Kalb*, 234 F.3d 827, 834 (3d Cir. 2000) (quoting *City of Lakewood, supra,* 486 U.S. at 759, 108 S.Ct. at 2138, 100 L.Ed.2d at 784).

with or detract from the promotion of public health, welfare, safety and recreation"; must "not [be] specifically intended to result in violence, crime or disorderly conduct"; and "will not entail unusual, extraordinary or burdensome expense to the City." *See* section 22, subsections (A), (B), (C), and (D). Subsection (E) also requires that "the facilities desired have not been reserved for other use at the day and hour required in the application."

If the Director decides to grant the permit, she is authorized to include "such reasonable conditions as [she] deem[s] appropriate." *See* section 20(A)(2). If she denies it, she must state in writing the reasons for the denial. *Id.* If the permit is denied, an appeal can be made within ten days to the Mayor, who must decide the appeal within five days. If the Mayor does not act within that time frame, he is "deemed to have sustained the appeal, and the permit shall be issued." *Id.*

Plaintiffs' argument is that even though section 20(A)(1) may be content-neutral, the factors set forth in section 22 that the Park Director is to use in deciding to grant a permit are so broadly worded that the Director can deny a permit based on the content of the applicant's speech. While acknowledging that some subsections are specific enough, like subsections (C) and (E),[17] Plaintiffs maintain that others are too broad, particularly pointing to subsec-

tion (A).[18] They assert that under *Shuttlesworth, supra,* section 22 thus violates the First Amendment.

This aspect of Plaintiffs' case is controlled by *Thomas v. Chicago Park District,* 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). In *Thomas,* the Supreme Court noted that even a content-neutral regulation could violate the Constitution if the decision-maker had such broad discretion that the decision could be based on the content of the message. The Court has thus required adequate standards to guide the decision-maker along with "effective judicial review." *Id.* at 323, 122 S.Ct. at 780, 151 L.Ed.2d at 791 (citing *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951)).

Unfortunately for Plaintiffs, however, *Thomas* upheld criteria substantively similar to those in section 22. That case dealt with Chicago's permit system for the use of its parks. Chicago's system had a number of criteria for the issuance of a permit, some specific like subsections (C), (D), and (E)[19] but at least one similar in scope to subsection (B) and arguably just as subject to as loose an interpretation as subsection (A).[20] Nonetheless, the Court rejected the argument that the criteria were not specific enough.

In doing so, the Court also relied on three other factors. First, the permit system imposed a deadline to process a per-

---

**17.** Subsection (D) would also fall into this category of being specific enough. It requires that the activity "not entail unusual, extraordinary or burdensome expense to the City."

**18.** Although not mentioned by Plaintiff, subsection (B) would appear to be subject to the same argument. It requires that the activity "not unreasonably interfere with or detract from the promotion of public health, welfare, safety and recreation."

**19.** For example, one criterion was whether a permit for the same time and place was al-

ready pending; another was whether the applicant had damaged park property in the past and had not paid for the damage. *Thomas,* 534 U.S. at 318 n. 1, 122 S.Ct. at 777 n. 1, 151 L.Ed.2d at 788 n. 1.

**20.** That one was whether "the use or activity ... would present an unreasonable danger to the health or safety of the applicant, or other users of the park, of Park District Employees or of the public." *Thomas,* 534 U.S. at 318 n. 1, 122 S.Ct. at 777 n. 1, 151 L.Ed.2d at 788 n. 1.

mit application (a maximum of twenty-eight days, an original period of fourteen days and a fourteen-day extension). *Id.* at 318, 324, 122 S.Ct. at 777, 780, 151 L.Ed.2d at 788, 792. Second, any permit denial had to be in writing specifying the reasons for the denial. *Id.* at 319, 324, 122 S.Ct. at 778, 781, 151 L.Ed.2d at 788–89, 792. Third, review was available, first by appeal to the General Superintendent of the Park District and then in the courts by way of Illinois' common law writ of certiorari, citing *Norton v. Nicholson,* 187 Ill.App.3d 1046, 135 Ill.Dec. 485, 543 N.E.2d 1053 (1989). *Id.* at 319, 324, 122 S.Ct. at 778, 781, 151 L.Ed.2d at 788–89, 792.

These additional factors are also satisfied in this case. Under section 20(a)(2), the Park Director has a deadline to decide a section 20(A)(1) permit application, three business days. Under the same section, she must give written reasons for any denial. Further, review of her decision is available from the Mayor under section 20(A)(2). And then from the Mayor judicial review is available by way of 2 Pa.C.S. § 752 and 42 Pa.C.S. § 933(a)(2).

Plaintiffs deny that judicial review is available, but the statutory provisions we just cited establish the contrary. In pertinent part, 2 Pa.C.S. § 752 provides, that "[a]ny person aggrieved by an adjudication of a local agency ... shall have the right to appeal ... to the court vested with jurisdiction of such appeals," as provided in Title 42. In turn, 42 Pa.C.S. § 933(a)(2) provides that the courts of common pleas shall have jurisdiction of appeals under section 752.[21] Tracking through the definitions provided in 2 Pa.C.S. § 101 leads to the conclusion that for the purpose of section 752 the Mayor is a "local agency" and his decision on any permit application is an "adjudication."[22]

Plaintiffs have also argued that the First Amendment requires "prompt" judicial review and that prompt judicial review is not available here. In support of this argument, they rely on *Thomas,* and *FW/PBS, Inc., supra.* Their reliance is misplaced. As noted in *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 21 (1st Cir.2002), the requirement of prompt judicial review originated in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), a case dealing with content-based regulation of the display of motion pictures. *FW/PBS, Inc.* also dealt with a content-based regulation, of sexually oriented businesses. In *Thomas,* the Supreme Court decided that a content-neutral regulation, like the one at issue here, did not have to comply with *Freedman's* procedural requirement of prompt judicial review. 534 U.S. at 325, 122 S.Ct. at 781, 151 L.Ed.2d at 793; *see also New England Regional Council, supra,* 284 F.3d at 21.

---

**21.** In pertinent part, 42 Pa.C.S. § 933(a)(2) provides as follows:

(a) General rule .... each court of common pleas shall have jurisdiction of appeals from final orders of government agencies in the following cases:

....

(2) Appeals from government agencies, except Commonwealth agencies, under Subchapter B of Chapter 7 of Title 2 (relating to judicial review of local agency action) or otherwise.

**22.** In pertinent part, section 101 defines a "local agency" as including a "government agency," which is defined, in part, as "any political subdivision" of the state "or any officer ... of any such political subdivision ...." In pertinent part, section 101 broadly defines an "adjudication" as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made."

In regard to the relevance of *Shuttlesworth, supra,* to this case, it does provide Plaintiffs with some faint support. In *Shuttlesworth,* the Supreme Court held that an ordinance that granted a city commission the authority to deny a parade permit on the grounds of "the public welfare, peace, safety, health, decency, good order, morals or convenience" placed too much discretion in the commission to withhold a permit based on its members' personal preferences. 394 U.S. at 150–51, 89 S.Ct. at 938–39, 22 L.Ed.2d at 167. This standard does seem to have the same breadth as two of the criteria in the Harrisburg ordinance [23] and one in the Chicago system.[24] However, *Shuttlesworth* is distinguishable from *Thomas* because in *Shuttlesworth* the decision-maker did not have to put into writing the reasons for any denial and there was no right of appeal to a higher municipal authority or to a court, factors the Court found important to the constitutional validity of the ordinance at issue in *Thomas.* Since, as discussed above, those factors are present here, we conclude that the grounds in section 22 do not "leave the decision to the whim of the administrator," *Thomas,* 534 U.S. at 324, 122 S.Ct. at 781, 151 L.Ed.2d at 792 (citing *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 133, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101, 113 (1992)), a concern of the Court in *Thomas.*

2. *The Challenge to Those Provisions Allowing the Exclusion of Individuals From Permitted Areas of the Parks.*

Section 10.301.29 in subsections (A)(1), (B), (C), (D)(1), and (E) directly control First Amendment activities in areas of the city's parks "for which permits have been previously issued for a private or public event" by prohibiting the distribution of literature in those areas while the permitted activity is going on. Section 20(A)(1) implies that it too prohibits literature distribution (and other First Amendment activities as well) in areas that have been permitted.[25] In any event, Park Director Manoogian–King stated that the city applies its permit system to exclude individuals from the permitted areas when the permit holders request it.

■ Plaintiffs' first challenge to these provisions is facial. We first decide (and it is not really disputed on the facial challenge), that these provisions are content-neutral. Although Defendant did not explicitly set forth the reason for limiting entry into the permitted areas to those with the permit holder's consent, the Park Director gave the obvious one; it ensures that permit holders can hold their events without disruption and for their exclusive use. Since this justification is without reference to the content of the regulated First Amendment activities, it is content-neutral. *Ward, supra,* 491 U.S. at 791, 109 S.Ct. at 2753, 105 L.Ed.2d at 675.

■ Plaintiffs next argue that the exclusion provisions fail the second part of the test because they are not narrowly tailored to serve a significant governmental interest, *id.,* 109 S.Ct. at 2753, 105 L.Ed.2d at 675. In Plaintiffs' view, the facial defect in the permit system is that it allows a permit holder to stage an event open to the general public but to preclude some individuals from entering the event on the basis of the content of their speech

---

**23.** Subsections (A) and (B) of section 22, quoted in Part II.A, above.

**24.** *See* note 20.

**25.** Section 20(A)(1)'s language speaks of groups that "require a reserved space or will occupy a portion of a park to the exclusion of others . . . ."

even though the excluded individuals' First Amendment activities would not interfere with the event and would be the same type of First Amendment activities being conducted by those who were allowed entry. Plaintiffs represent that they have no interest in renting a booth at an event to disseminate their ideas, but they do believe that the exclusion provisions prohibit "much more speech than needed" (doc. 23, Plaintiffs' brief, filed August 29, 2002, at p. 21) when it precludes them from entering an event and merely engaging in conversation as others would.[26]

We examine this facial challenge in light of the Park Director's interpretation and application of these sections. *See Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 2402, 120 L.Ed.2d 101, 111–12 (1992)("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.")(citing *Ward, supra,* and other cases). The Park Director testified that persons are excluded from permitted areas when the permit holder requests it, so we examine these provisions in that context, where the private parties who have the permit control who can enter the permitted area, and the police enforce that control by arresting or citing those who do not comply. Indeed, even though Plaintiffs speak about the "Ordinance" excluding them from permitted areas, their real complaint is about how the city has applied the exclusion

sections to enforce the permit holder's decision on who can enter the permitted area.[27]

Once Plaintiffs' claim on the exclusion provisions is accurately seen as one based on the decision of event organizers to exclude them, Plaintiffs' claim must fail, not because the three-part test is not satisfied here, but because the organizer's conduct is not state action under section 1983, even if the city authorized the exclusionary conduct, assisted it by citations and other enforcement actions by its police, and retained ultimate control over the permitted areas by the power to revoke a permit under section 10–301.26.

■ In *United Auto Workers v. Gaston Festivals, Inc.,* 43 F.3d 902, 910 (4th Cir.1995), the defendant, Gaston Festivals, had a permit from Gastonia, North Carolina, to conduct a one-day festival in the downtown, covering public streets and sidewalks (as well as some private property). Although the city retained ultimate authority over the permitted public areas, *id.* at 909, implicit in the grant of the permit was conferral of authority on the defendant to determine who could enter the permitted area and on what conditions. *Id.* at 910–11. Defendant allowed local groups to distribute literature from booths on the site but prohibited the plaintiff, a local of the United Auto Workers, to use a booth to distribute pamphlets advocating the union's political positions because the defendant wanted to avoid political, ideo-

---

26. In making this argument, Plaintiffs recognize that a permit system serves valid governmental interests in preventing scheduling conflicts for park uses, and in providing city services, such as police protection, electricity, and trash removal, (doc. 23, p. 20,), but assert that the exclusion provisions go beyond these interests, so that Defendant's reliance on them is irrelevant.

27. Plaintiffs complain that "Defendant cannot enforce the viewpoint discrimination of private parties that are given limited control over public property," (Doc. 23, p. 17), and that "a private party has been given discretion to regulate the speech in a traditional public forum." (*Id.,* p. 18). They further assert that the city "cannot wash its hands of" the content-based discrimination of event organizers "by delegating the regulation and discrimination to a private party." (*Id.*).

logical and controversial topics. Seeking injunctive relief, the plaintiff sued under section 1983, alleging that the organizers were violating the union's First Amendment rights by not allowing it to use a booth to distribute literature. The Fourth Circuit rejected the claim, reasoning that the defendant's conduct was not state action, as required by section 1983.[28] The court rejected an argument that the defendant was performing a public function (and hence engaging in state action) when the city ceded to it the regulation of speech in the permitted area.[29] The court stated:

> When it permits [the defendant] to use the streets and sidewalks ... Gastonia does not cede to [the defendant] the sovereign power to regulate speech on those streets and sidewalks. That the City must issue the permit and that it retains the authority to revoke it, prove that the City has not ceded its ultimate regulatory powers. The City's award of the permit merely allows [the defendant] to use the streets and sidewalks for the time and purpose of the permit.

*Id.* at 910.

The court concluded that the defendant's power over who could use a booth at the festival did have an incidental effect on the manner in which union members could speak at the festival but observed that:

> If a party obtaining a permit to use public property for a specific event were constitutionally required to admit unconditionally everyone seeking admission, it

would be virtually impossible to hold the event for which the permit was obtained. *Id.* at 910–11.

Echoing the Park Director's concern here about disruption of social events like weddings held on public property, the court closed with these comments:

> The consequences of finding state action in this case would be difficult to overstate. Were we to hold that the incidental power to exclude others from public property during the course of a limited, permitted use transformed the permit holder into a state actor, softball teams on the Mall in Washington, D.C. would be constitutionally obliged to afford due process to those not allowed to play on the particular field at the same time. Every family that barbecues at a public park would theoretically be barred from excluding uninvited guests on constitutionally suspect grounds. The local church could no longer use public facilities to hold events for fear of violating the Establishment Clause. Every picnic, wedding, company outing, meeting, rally, and fair held on public grounds would be subject to constitutional scrutiny merely because the organizer had "been granted exclusive use of city facilities ... as well as authority to determine who may use those ... facilities and what they may say while on the public fora." Appellant's Br. at 23.

*Id.* at 911.

*United Auto Workers, supra,* dealt solely with the authority of a permit holder to

28. The state-action requirement arises from the language of section 1983 imposing liability for violations of the Constitution under "color of state law." *See, e.g., Crissman v. Dover Downs Entertainment Inc.,* 289 F.3d 231, 233 and n. 2 (3d Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 131, 154 L.Ed.2d 147 (2002) (No. 02–175).

29. *United Auto Workers* is thus not distinguishable because the defendant there, unlike

in this case, allowed individuals (there the union members) to attend the festival to discuss their views with others. The focus is on the absence of state action, which means that the First Amendment does not constrain a private entity from discriminating on the basis of the content of a message or the type of First Amendment activity.

exclude individuals from the permitted area, but the result is no different when we add the enforcement of the exclusion by the city police, as for example, by the citations issued at the July 2000 Gay Pride Day and the police's prohibition on the distribution of literature at the October 2000 Gaytober Fest. In *Lansing v. City of Memphis*, 202 F.3d 821, 833 (6th Cir.2000), the city's assistance in excluding a street preacher from a festival at the organizer's request did not turn the request into state action. *Id.* ("If this were all that was required to find state action, then every private citizen who solicited the aid of the police in resolving disputes or in ejecting unwanted persons would be transformed into a state actor.").

*United Auto Workers* and *Lansing* were suits against the private parties who were the organizers of the festivals, but they are equally applicable here to a suit against the Mayor. *See Gannett Satellite Info., supra,* 894 F.2d at 66–67 (claim against bi-state port authority officials that the authority's leases with airport concessionaires improperly delegated broad discretion to the concessionaires to decide which newspapers to sell failed to state a First Amendment claim because the concessionaires' decisions would not be state action); *Reinhart v. City of Brookings*, 84 F.3d 1071 (8th Cir.1996) (citing *United Auto Workers* in ruling that a city was not liable under section 1983 for actions of a festival committee that barred a politician from handing out literature at the festival since it was the committee's rules that imposed the prohibition and the committee's actions could not be attributed to the municipality).

We reject Plaintiffs' argument, based on *Lee v. Katz*, 276 F.3d 550, 556 (9th Cir.),

cert. denied sub nom. *Oregon Arena Corp. v. Lee,* —— U.S. ——, 122 S.Ct. 2358, 153 L.Ed.2d 180 (2002), that the Mayor cannot avoid his First Amendment responsibilities here by conferring on private parties the discretion to regulate speech in permitted areas of a traditional public forum. In that case, the Ninth Circuit held that a corporation was subject to the First Amendment when regulating public speeches on public land leased by it from Portland, Oregon, known as the Rose Quarter Commons, a large open-air plaza adjacent to several public facilities. 276 F.3d at 552. People passed through the Commons "on their way to shows, concerts, games, and restaurants," *id.* at 555, and public events were held there. *Id.* The corporation had leased it for many years, beginning in January 1993. *Id.* In these circumstances, the Ninth Circuit ruled that by regulating free speech within the Commons the corporation was performing a public function and thereby became a state actor subject to First Amendment requirements by way of section 1983.

*Lee* is distinguishable. Unlike here, where we are dealing with only portions of the city parks, some small enough for a family picnic or wedding, the Ninth Circuit dealt in the Commons with the equivalent of a city park itself. Also, the private party's lease in that case was long-term, running for years. Here, permits last a day. Indeed, the Ninth Circuit stated that it would "not hold that everyone who leases or obtains a permit to use a state-owned public forum will necessarily become a state actor," *id.* at 556, and cited *Lansing, supra, and City of Memphis, supra,* as cases where it would not.[30]

As noted, Plaintiffs also make an as-applied challenge to the exclusion provi-

---

**30.** Plaintiffs also cite *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), but that case is also distinguishable because it dealt with a company-owned town in which the company had taken over all aspects of municipal authority.

sions as they relate to permitted areas of the parks. We reject this claim for two reasons. First, the absence of state action is as fatal for this claim as it is for the facial challenge. Second, based on our discussion below concerning Plaintiffs' disorderly-conduct as-applied challenge, we conclude that the police's exclusion of Plaintiffs from the permitted areas was not based on the content of their speech.

3. *The Challenge to the Provision Prohibiting Literature Distribution in the Areas Around the Civil War Museum.*

■ Plaintiffs make facial and as-applied challenges to the ban on literature distribution on the grounds of the National Civil War Museum in Reservoir Park. Under subsection (A)(2) of section 10–301.29, literature may not be distributed in Reservoir Park, in "those areas occupied by the National Civil War Museum and the fields, lawns, and park areas adjacent to the Museum and under its control." [31]

The parties disagree about the type of forum the museum and its grounds are (which we will sometimes refer to collectively as the museum). The museum's status is important to the standard we must apply to the challenged provision. Plaintiffs imply it remains a traditional public forum because it was built in an area carved out of such a forum, Reservoir Park, and that the city has improperly tried to convert the museum into a limited public forum "by ipse dixit." (Doc. 23 at p. 22). Defendant contends that it is either a limited public forum or a nonpublic forum.

■ Plaintiffs' ipse dixit argument fails. They correctly observe that a traditional public forum cannot be converted into a limited public forum by an ipse dixit pronouncement simply declaring it to be

so. *See First Unitarian Church v. Salt Lake City Corp.*, 308 F.3d 1114, 1124 (10th Cir.2002)("The government cannot simply declare the First Amendment status of property regardless of its nature and its public use."). However, the city did not simply declare this portion of Reservoir Park to be a limited public forum; it made obvious and substantial physical alterations by constructing the museum and modifying the immediately surrounding grounds. Such physical alterations can change the nature of a public forum. *See Hawkins v. City and County of Denver,* 170 F.3d 1281, 1287–88 (10th Cir.1999)(former public street converted to nonpublic forum by being converted into a pedestrian walkway that dead-ends at various art complexes) (quoting *International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 699–700, 112 S.Ct. 2711, 2718, 120 L.Ed.2d 541, 564 (1992))(Kennedy, J., concurring). The city's construction of the museum and alteration of the surrounding parkland support its claim that the museum and surrounding grounds are no longer a traditional public forum.

We conclude that it should now be considered a limited public forum, that is, a forum open to some First Amendment activities but not all. Three factors lead to that conclusion. *See Kreimer, supra,* 958 F.2d at 1259–61. First, the city obviously did not have to build the museum, thus indicating it is not a traditional public forum. Second, the city has built and operated the museum (through the nonprofit corporation) only for a limited subject matter, as a source of information and education on the Civil War era. *See also Hotel Employees & Restaurant Employees Union, supra,* 311 F.3d at 553–54 (prohibition on use of Lincoln Center plaza for any expressive activity other than arts- and performance-related activity would

---

**31.** We do not view this as a facial challenge to leafleting in the museum itself.

support conclusion that it was a limited public forum in a challenge to a ban on other expressive activity, including union leafleting). Third, although the museum focuses on certain First Amendment activities (the exchange of ideas about the Civil War), its grounds are not incompatible with other First Amendment conduct, specifically, the activity at issue here, literature distribution.

▮ As a limited public forum, there are certain First Amendment activities permitted on museum grounds and others that are not. For example, lectures or programs on a Civil War topic authorized by the museum and the public's attendance at these activities would be permitted uses, but activities concerning other topics (including the immorality of homosexual activity) would not. In a challenge to a restriction on a nonpermitted First Amendment activity in a limited public forum, we apply a less stringent standard than we do for regulations involving the traditional public fora of streets, sidewalks and parks. Regulation of First Amendment activities in a limited public forum need only be: (1) reasonable; and (2) not an effort to suppress First Amendment activity based on the actor's viewpoint. *Kreimer, supra,* 958 F.2d at 1256, 1262.

In both *New England Regional Council, supra,* 284 F.3d 9, and *Hawkins, supra,* 170 F.3d 1281, the reasonableness element of this test has been fleshed out by relying on Justice O'Connor's concurrence in *International Soc'y for Krishna Conscious-*

*ness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (*ISKON*), as the narrowest ground for the decision in that case. *New England Regional Council,* 284 F.3d at 20 n. 5; *Hawkins,* 170 F.3d at 1289.[32] We will use the same approach here, especially since in the instant case the physical characteristics of the forum are important.[33]

▮ Under this approach, the court conducts "a factually-intensive, individualized inquiry" which examines "the uses to which the forum typically is put ... and the proffered rationale for the restriction." *New England Regional Council,* 284 F.3d at 20. The court also "examine[s] the particular nature of public expression" at issue "and the extent to which it interferes with the designated purposes of the [museum and its grounds], given [their] physical attributes." *Hawkins,* 170 F.3d at 1290.

▮ We dispense first with the second element of the test. Plaintiffs argue that the ban on leafleting is content– or viewpoint-based, because section 29(A)(2) was adopted to prevent Plaintiffs from distributing information about the immorality of gay and lesbian sexual activity. We reject this argument based on our discussion below of Plaintiffs' as-applied challenge to the city's use of the Pennsylvania disorderly conduct statute. We conclude that the provision is instead a content– and viewpoint-neutral attempt to provide for the public's peaceful and safe enjoyment of the museum grounds.

**32.** These cases dealt with nonpublic fora, but this is not material since the same First Amendment standard applies to both limited public fora and nonpublic fora. *See United States v. Goldin,* 311 F.3d 191, 196 (3d Cir. 2002) (applying nonpublic-forum reasonableness standard to a limited public forum); *Kreimer, supra,* 958 F.2d at 1262; *Hotel Employees & Restaurant Employees Union, supra,* 311 F.3d at 553–54.

**33.** We also note that the approach is in general accord with the Third Circuit's position. *See Christ's Bride Ministries, Inc. v. SEPTA,* 148 F.3d 242, 255 (3d Cir.1998)(reasonableness of First Amendment restriction in a nonpublic forum determined by the nature and purpose of the forum, citing in part Justice O'Connor's concurrence in *ISKON*).

In regard to the reasonableness element, Defendant has not attempted to justify the ban, appearing to argue that it is reasonable simply because the museum is not a traditional public forum and that the city is therefore entitled to prohibit First Amendment activities that are not consistent with the museum's purpose. (Doc. 27 at p. 22).

In light of the reasonableness standard set forth above, this position is incorrect. The city is not entitled to ban nonpermitted First Amendment activities on these bases. Rather, there has to be an individualized examination which, in part, takes into account the nature of the banned public expression and the extent to which it would interfere with the uses of the forum, not merely whether it would be incompatible with those uses.

■ We conclude that the ban on literature distribution on the museum grounds is not reasonable. First, the uses to which the museum grounds are put, Civil War memorial and educational programs, do not require a ban on leafleting. Leafleting would not necessarily interfere with those activities. Second, the Mayor proffers no rationale for the ban, so this factor does not weigh in Defendant's favor. Third, the public expression at issue here is leafleting, a First Amendment activity that intrudes minimally on those passing by who need only engage in the mechanical task of taking or refusing the leaflet or tract from the leafleteer's hand. *See ISKON, supra,* 505 U.S. at 690, 112 S.Ct. at 2713, 120 L.Ed.2d at 558 (O'Connor, J. concurring); *Hotel Employees & Restaurant Employees Union, supra,* 311 F.3d at 554–55; *Hawkins, supra,* 170 F.3d at 1289. Fourth, given the physical characteristics

of the museum grounds, leafleting would not interfere with the designated purposes of the grounds. The grounds are large, including a parking area for 250 cars and another area for recreational vehicles and buses. This is enough space to allow at least one or two people to leaflet on the museum grounds. *Compare Hawkins, supra,* 170 F.3d at 1284, 1290–91 (rejecting as-applied challenge to a ban on leafleting during peak usage hours on a nonpublic-forum walkway with a width of about thirty-two to forty feet, finding the ban reasonable).

We therefore conclude that Plaintiffs' facial challenge to the ban on literature distribution on the grounds of the Civil War Museum has merit. Based on this conclusion, we need not examine their as-applied challenge for the purpose of granting injunctive relief.[34]

4. *The Challenge to the Permit Requirement For an Individual or Group to Obtain a Permit Before Distributing Literature or Making Speeches in City Parks.*

■ Under section 10–301.23(A)(1)("section 23(A)(1)"), any person or group of persons (regardless of the group's size) intending to distribute literature or make public speeches in city parks must obtain a permit, and under section 10–301.23(A)(2) ("section 23(A)(2)"), if they apply for a permit after 12:00 p.m. on a Friday, the Park Director does not have to issue it until Monday. Plaintiffs challenge these provisions as not being narrowly tailored to a significant governmental interest. They have four concerns. First, a permit requirement for an individual is in itself improper (seemingly as opposed to a

---

**34.** Plaintiffs meet the third requirement under *Roe, supra,* 919 F.2d at 867 n. 8, for injunctive relief because the balance of equities easily tips in their favor. Based on our discussion above, no valid city purpose would be served by allowing the ban to be enforced while enjoining it would protect the First Amendment rights of leafleteers.

permit for a group which would raise valid concerns for crowd control and sanitation). Second, a permit requirement hinders an individual's spontaneous decision to speak; a person who has decided to speak on the spur of the moment simply cannot go to a city park and address passersby. Third, even if a person tries to obtain a permit, section 23(A)(2) allows the Park Director to put off granting the permit until Monday if the application is made after 12:00 p.m. on a Friday, thereby precluding any speech or leafleting on the weekend. Fourth, section 23(A)(1) reaches conduct that does not conflict with other users of the park.

Defendant makes no attempt to defend section 23(A)(1). He simply asserts that it "is not at issue" (doc. 27, Defendant's brief, filed September 16, 2002, at p. 19) because Plaintiffs' conduct did not involve any attempt to distribute literature or make speeches in the parks; rather, it involved their conduct at festivals being held by others. However, as with Plaintiffs' challenge to section 20(A)(1), we believe that they have standing to make a facial challenge to section 23(A)(1) under *Lakewood, supra.*[35]

Although hindered by Defendant's failure to defend section 23(A)(1), we agree with Plaintiffs that the section violates the First Amendment. Substantively similar permit requirements, reaching even a single person's First Amendment activity in traditional public fora, have been struck down for not being narrowly tailored to serve a significant governmental interest.

In *Community For Creative Non–Violence v. Turner,* 893 F.2d 1387 (D.C.Cir. 1990), the local transit authority issued a regulation requiring individuals and groups who wanted "to engage in free speech activities" in an "organized" way on the authority's property to first obtain a permit. After determining that the property was a traditional public forum, the court of appeals ruled that the permit requirement was facially invalid because it was not narrowly tailored to a significant governmental interest. Even if the regulation only reached two or more individuals speaking at a bus stop, it covered speech that was not a threat to the authority's ability to provide safe and efficient transportation. *Id.* at 1392.

In *Grossman v. City of Portland,* 33 F.3d 1200 (9th Cir.1994), the Ninth Circuit struck down a similar restriction for not being narrowly tailored. The defendant city had made it unlawful for any person to participate in an organized demonstration or make any address in a city park without a permit. The city attempted to justify the ordinance by asserting that it covered speech most likely to affect the public's safety and convenience in the use of the parks. However, and distinguishing permit requirements for large groups, the court of appeals noted that the law reached conduct not likely to affect such interests, for example, a person simply listening as someone else spoke. *Id.* at 1206. It also noted that the permit requirement may deter some from speaking or others from engaging in spontaneous speech. *Id.* The court characterized the latter as sometimes the most effective type of speech.

Similarly, section 23(A)(1) covers speech that is no threat to the city's interests, presumably, in public safety and the public's use and enjoyment of the park. While section 23(A)(1) covers only two First

---

**35.** See note 16. *See also New England Regional Council of Carpenters, supra,* 284 F.3d at 19("leafletters may facially challenge permit schemes despite the fact that they neither applied for a permit to distribute handbills on a particular street nor made definitive plans to do so").

Amendment activities, literature distribution and speeches, these represent important First Amendment rights that section 23(A)(1) would broadly limit. The section would require even a single individual to obtain a permit before speaking in city parks, regardless of the circumstances in which he wanted to speak. Obviously, much speech that is no impediment to the city's interests would be covered by the section. Speech that is spontaneous would also be curtailed. As Plaintiffs argue from *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, ——, 122 S.Ct. 2080, 2090, 153 L.Ed.2d 205, 220 (2002), which struck down a permit system for door-to-door canvassers, protection of spontaneous speech is important to the free and general discussion of public matters.

We conclude that section 23(A)(1) is facially defective as not being narrowly tailored to serve a significant governmental interest and will enjoin its enforcement. We note that for the same reasons mentioned in note 34 above, the third requirement for permanent injunctive relief is satisfied here.

5. *The Challenge to the Provision Prohibiting Literature Distribution in the Areas of City Island Subject to Long-Term Leases for Commercial Activities.*

■ Plaintiffs make a facial challenge to the ban on literature distribution in the areas leased on City Island for commercial activities. Under subsection (D)(2) of section 10.301.29, literature may not be distributed on City Island in "those areas occupied by leaseholders and park areas under leaseholders (sic) control." As the Park Director testified, these areas are commercial entities, consisting of batting cages with an arcade area, the water golf area, a train station with a carousel, River-

side Village Park, and the Harrisburg Senators Baseball Stadium.

We will not consider this challenge. At best for Plaintiffs, these areas would be limited public fora. Plaintiffs presented no evidence at the hearing concerning their uses and physical characteristics, essential elements of the standard we must employ to evaluate the reasonableness of the ban. *See New England Regional Council, supra,* 284 F.3d at 20, and *Hawkins, supra,* 170 F.3d at 1290. We therefore have no basis to evaluate the claim.

6. *The Challenge to Section 10–301.30.*

■ Section 10–301.30 ("section 30") prohibits leafleteers from blocking the entrance or exit from any park or commercial business or any commercial activity, requires them to stand on the grass off the walkways while distributing literature and to keep moving while on the walkways.

We will not consider Plaintiff's challenge to this provision, made on overbreadth grounds, because they lack standing to do so. Plaintiffs were never cited or arrested for a violation of this provision. Hence, they could only make a facial challenge to it. Such a facial challenge on overbreadth grounds by a person not affected by the law is permitted, however, only when there is a significant danger that the First Amendment rights of parties not before the court would be curtailed. *See Kalb, supra,* 234 F.3d 827, 834. Section 30 does not present this danger since it does not appear that leafleting would be significantly impaired by a requirement that the leafleteer not obstruct entrances or exits, stand on the grass off parkland walkways or keep moving while on the walkways. A challenge to this provision can await a person who has actually been cited under it, and who would, perhaps, feel deterred by a requirement that she stand on the grass or keep moving while on public walk-

ways in the course of distributing literature.

### B. The Challenge to the City's Application of Pennsylvania's Disorderly Conduct Statute.

 Plaintiffs argue that the city has applied Pennsylvania's disorderly conduct statute to them in violation of their First Amendment rights. The substance of the offense is defined in 18 Pa.C.S. § 5503(a).[36] Under the statute, "whether a defendant's words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." *Commonwealth v. Hock*, 556 Pa. 409, 415–16, 728 A.2d 943, 946 (1999). "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." *Id.* at 416, 728 A.2d at 946 (quoting *Commonwealth v. Greene*, 410 Pa. 111, 115, 189 A.2d 141, 144 (1963)).

Plaintiffs argue that they were arrested or threatened with arrest for disorderly conduct because of the content of their speech, which was directed against homosexual activity. However, defense testimony at the hearing contradicted Plaintiffs' contention, and we credit that testimony, which was that Plaintiffs had gone beyond legitimate First Amendment activity. Hence, we will not subject Defendant to an injunction concerning enforcement of the disorderly conduct statute by the city police.

We review the incidents on which this claim is based. On June 9, 2000, plaintiffs, Sheri Sucec and Jeff Mayon, were arrested for disorderly conduct but had potentially committed offenses covered by section 5503(a)(1) by moving toward the Mayor and museum director, shouting as they went. On July 29, 2000, plaintiff Garisto was charged under sections 5503(a)(2) and (4) but had tried to get past the citing officer into the Gay Pride event. On October 7, 2000, plaintiff Young was charged with disturbing the peace but only for his actions in shoving a tape recorder into people's faces.[37] On July 28, 2001, at the Gay Pride Day, plaintiffs, Mark Diener, Jason Storms, and Lee Smith were charged with disorderly conduct. However, Diener's charge was based on a neighbor's complaint about his beating on a snare drum, and he was only charged after Harrisburg police sergeant Ellis Roy repeatedly told him to stop. The other two had been shouting though a megaphone. We also note that, despite their contention that the police had acted to shut down their speech, Plaintiffs had been expressing their views on gays and lesbians for several hours before being charged.

 Street preaching in a public park in a loud manner is First Amendment activity not covered by the disorderly conduct statute's prohibition in subsection 5503(a)(2) on "unreasonable noise." *Com-*

---

**36.** Section 5503(a) provides as follows:

A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) engages in fighting or threatening, or in violent or tumultuous behavior;

(2) makes unreasonable noise;

(3) uses obscene language, or makes an obscene gesture; or

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

**37.** There were other incidents, occurring on February 8 and 12, 2001, and July 27, 2002, but we do not discuss them because they do not relate to the as-applied challenge to the use of the disorderly conduct statute. In any event, we conclude that any law-enforcement action taken during those incidents was not motivated by a desire to suppress Plaintiffs' speech.

*monwealth v. Gowan,* 399 Pa.Super. 477, 482, 582 A.2d 879, 881 (1990). Nonetheless, "the exercise of free speech can go beyond constitutionally protected boundaries to the realm of prohibitive and criminal behavior." *Id.* at 481, 582 A.2d at 881. Here, Plaintiffs moved beyond protected speech into an area of unlawful activity. Hence, the city has not been applying Pennsylvania's disorderly conduct statute in violation of the First Amendment, and injunctive relief in this regard would be inappropriate.

We will issue an appropriate order.

### ORDER

AND NOW, this 2nd day of December, 2002, it is ordered that:

1. Plaintiffs' motion for a preliminary injunction (doc. 13), converted into a motion for a permanent injunction, is granted in part and denied in part.

2. Defendant is hereby permanently enjoined from enforcing sections 10–301.23(A) and 10–301.29(A)(2) of the City of Harrisburg Codified Ordinances.

3. In all other respects, the motion is denied.