

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-2003

# Diener v. Reed

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-1405

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Diener v. Reed" (2003). *2003 Decisions.* Paper 208.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/208

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1405
_____


MARK A. DIENER; STEPHEN GARISTO; JIM
GROVE; PEARL GROVE; JEFF MAYON; LEE
SMITH; JASON STORMS; MICHAEL SUCEC;
SHERI SUCEC; JOHN K. YOUNG


v.


STEPHEN R. REED, in his Official Capacity
as Mayor of the City of Harrisburg


Mark A. Diener, Stephen Garisto, Jim Grove, Pearl Grove, Jeff
Mayon, Lee Smith, Jason Storms, Michael Sucec, and Sheri Sucec,

Appellants


_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(Civil Action No. 02-cv-00977)
District Judge:  The Honorable William W. Caldwell
_____

Submitted Under Third Circuit LAR 34.1(a)
September 19, 2003

BEFORE: McKEE, SMITH, Circuit Judges and SCHILLER,[*] District Judge.[**]

(Filed October 10, 2003)

_____

OPINION OF THE COURT
_____

SMITH, Circuit Judge.

## I.     INTRODUCTION

Appellants challenge the denial of an injunction against the City of Harrisburg

("Appellee") on the basis that the Pennsylvania Disorderly Conduct statute (18 Pa. C.S.A.

§ 5503) is unconstitutional as applied, and that §§ 10-301.20 and .29 of the City of

Harrisburg's Parks Ordinance are unconstitutional, both on their face and as applied.  For

the reasons set out below, we will affirm the decision reached by the District Court.

## II.     FACTS AND PROCEDURE

Title X of the City of Harrisburg's Codified Ordinances governs the use of the

City's parks and the allocation of space between the approximately two million annual

visitors to the parks.  Section 10-301.20(1)(A) requires that a permit be obtained from the

---

[*]     Honorable Berle M. Schiller, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

[**]     This case was originally scheduled for argument, however, at the request of both parties' counsel the argument was called off due to weather conditions and the case was submitted.

1

Director of City Parks for any event in which twenty or more persons are to participate or may be anticipated to attend, or which would require a reserved space or would occupy a portion of a park to the exclusion of others. Section 10-301.29 addresses the distribution of literature in the parks, providing that literature may be distributed anywhere except those areas for which a permit has already been obtained, the National Civil War Museum and grounds, and areas occupied by leaseholders.

Appellants appear periodically at various locations and events in and around the Harrisburg City parks to "preach the gospel, preach against the sin of sodomy, and preach that people can be set free from such sin." Appellee, Stephen R. Reed, is the Mayor of Harrisburg and is involved in the permitting process to the extent that applicants denied a permit can, under the ordinance, appeal the denial to him. *See* §10-301.20(2).

Appellants have been involved in seven incidents which they contend demonstrate the facial unconstitutionality of the sections of the City Ordinance in question and the unconstitutionality of the Pennsylvania Disorderly Conduct statute as applied to them. These incidents were described in detail in the well-written opinion of the District Court (*see Diener v. Reed*, 232 F.Supp.2d 362, 371-75 (M.D.Pa. 2002)), but for the purpose of providing background some of the basic details are recited herein.

1. June 9, 2000 - National Civil War Museum: To protest a proclamation by the Mayor which Appellants interpreted to condone "Sodomite activities," Sheri Sucec and Jeff Mayon went to the National Civil War Museum during a ceremony honoring the

2

Civil War dead. Their protest involved carrying a banner which read, "Proof That America Condones Sodomy," and a sign stating, "Blessed the Nation Whose God is the Lord." They sang hymns, distributed literature regarding the Mayor's proclamation and spoke with passersby. Appellants claim that they simply watched and listened while the ceremony was going on and that the Mayor approached them and "exploded" after they gave him the proclamation he had issued. They further claim that they were arrested as they were complying with Mayor's request for them to leave the park. George Hicks, the Museum's Chief Executive Officer testified that Appellants "were moving towards the podium area up against where the building was located and shouting and protesting and saying all kinds of things." Hicks said that as "the lady kept moving towards" him, he told his wife to "get to the car, get out of here now." Sucec moved closer to Hicks and Mayon toward the Mayor, "haranguing and shouting in [his] face," until they were "literally within arm's length." City Park Ranger Thomas McDowell also testified that police and park rangers were called to the area because, despite repeated requests by the Mayor for Sucec and Mayon to leave, they refused. According to McDowell, Sucec was very loud and kept coming forward, telling the Mayor he was killing people. McDowell testified that he was concerned for the Mayor's safety. Sucec and Mayon were arrested for Disorderly Conduct.

2. July 29, 2000 - Gay Pride Day: Stephen Garisto and Sheri Sucec evangelized, passed out tracts, and spoke with passersby outside the boundaries of the event. Garisto

attempted to enter the event but was denied admission. Garisto contends that the police officer on the scene told him that he could not be there preaching and passing out tracts, and that he had to be 500 feet from the event. The Director of the Department of Parks and Recreation, Tina Manoogian-King testified, however, that she observed Garisto, "screaming in a very loud obnoxious manner." She testified that Garisto was "quite frankly . . . out of control running around, screaming and yelling and spewing his rhetoric . . . with signs [and] . . . bull horns." Manoogian-King also testified that she witnessed Garisto "confront and basically scream in the face of police officers," and recounted that one woman with a child was so intimidated by Garisto's conduct that she requested that a police officer escort her to her car when she wanted to leave the festival. When police advised the group not to block the area, they would comply and return to the sidewalks or a traffic island, but then step back onto the street when the officers turned their backs, "almost in a manner that was taunting to the Police." The police officer on the scene cited Garisto for Disorderly Conduct under 18 Pa.C.S. § 5503(a)(2) and (4).

3. October 7, 2000 - Harrisburg Gaytober Fest: Sheri Sucec and John Young attended the Gaytober event. Officer Brenda Holmes observed Young with a handheld tape recorder which he put "in front of people's mouths, like two or three inches from their face." At first, Officer Holmes allowed Young to pass out literature within the festival, but she was then informed that while vendors had paid a fee for spots inside the festival, Young had not. Officer Holmes told Young that "he could go ahead and hand

4

out his brochures, but he would have to do it behind the barricades." Young refused to stop distributing the brochures despite numerous warnings. After issuing him warnings, "all day long," Holmes arrested Young and charged him with disturbing the peace.

4. February 8, 2001 - Private Opening of the National Civil War Museum: Sheri and Michael Sucec showed up at the invitation-only event and were told they could not attend. The Sucecs drove down to the entrance to the park and stood in the park near the street. Michael Sucec held his Bible up and Mrs. Sucec displayed a sign that read, "Blessed Is the Nation Whose God is the Lord." Eventually, after being asked to leave, the Sucecs left the park.

5. February 12, 2001 - Public Opening of the National Civil War Museum: The Sucecs attended the grand opening of the Museum. Mrs. Sucec held her sign reading, "Blessed Is the Nation Whose God is the Lord," and Mr. Sucec started to preach. Museum CEO, George Hicks testified that "there was some agitation" toward the end of the event and the Sucecs were asked to leave. According to Hicks, when the couple was asked to leave, Mrs. Sucec began confronting other guests and asking in a tone that was "somewhere between inquisitive, militant or threatening," whether those guests held permits.

6. July 28, 2001 - Gay Pride Day in Riverfront Park: A group consisting of Jason Storms, Mark Diener, Lee Smith, Jerry Fennel and others were preaching from the sidewalk across the street from the park. They preached, displayed signs and sang hymns.

5

At some point, they began to use a megaphone. Diener also played a snare drum periodically during the day. Appellants claim that Diener was arrested without warning, followed by Smith, Garisto and Storms. Officer Ellis Roy testified that although things had gone well with the protestors for most of the day, there was a "breakdown" around three-thirty or four in the afternoon. Officer Roy noted that the group switched from generalized protest to using the megaphone to direct comments at particular individuals at the festival. Roy recalled, "I could see that would descend in a hurry, that people's tolerance was not high. I didn't want them to get one of those guys who didn't particularly care for that, and now I got a fight on my hands. I had to curtail that." The police also received a complaint about the use of the drum next to residential buildings. After repeated warnings about the use of the drum, Diener continued to play and was finally arrested and charged with Disorderly Conduct. While Diener was being arrested, Storms and Smith began to yell at the officers through the megaphone and to play a horn. They, too, were arrested for Disorderly Conduct. Id.

7. July 27, 2002 - Gay Pride Day: Garisto testified that he observed people being prohibited from speaking and preaching at the event. Sheri Sucec testified that she saw a man reading from the Bible in a normal tone of voice outside the entrance of the event, but three police officers told him he had to go to the street or across the street. Jennifer Ellis, a volunteer worker at the event, testified that she observed several of the protestors "shouting and heckling people, harassing people, getting in people's faces saying

6

derogatory comments, calling people names, causing a great deal of disruption making so much noise that at times it was interfering with the performers on the main stage."

The U.S. District Court for the Middle District of Pennsylvania granted partial relief by striking down §10-301.23(A)(1) (requiring permit before distributing literature or speaking to groups of one or more persons in a park) and §10-301.29(A)(2) (prohibiting the distribution of literature in one of the City's parks around the National Civil War Museum). *Diener v. Reed*, 232 F.Supp.2d 362 (M.D.Pa. 2002) (Caldwell, J.). The District Court held that the permit requirement in §10-301.23(A)(1) was not narrowly tailored to serve a significant governmental interest, and enjoined its enforcement. *Id.* at 388. Because the section would require even a single individual to obtain a permit before speaking in city parks, the District Court found that spontaneous speech and speech that is no threat to the city's interests would be curtailed. *Id.* at 387-88. Similarly, the Court concluded that the ban on literature distribution on the museum grounds set out in §10-301.29(A)(2) was not reasonable because although the museum grounds are a limited public forum, the uses to which the grounds are put do not require a ban on leafleting. *Id.* at 386. The Court noted that leafleting, as a vehicle for First Amendment activity, "intrudes minimally on those passing by who need only engage in the mechanical task of taking or refusing the leaflet or tract from the leafleteer's hand." *Id.*

As to the rest of Appellants' claims, however, the District Court found that the standards set out in §10-301.22 provide sufficient criteria for determination of permit

7

applications under *Thomas v. Chicago Park District*, 534 U.S. 316 (2002). *Diener*, 232 F.Supp.2d at 379. The District Court also held that the justification for provisions allowing exclusion of individuals from permitted areas of the parks (i.e., that they ensure that permit holders can hold their events without disruption and for their exclusive use) are content-neutral, and that Appellants' complaint that the provisions are not narrowly tailored to serve a governmental interest fail because the permit-holders' use of the exclusion provisions does not amount to state action under 42 U.S.C.A. § 1983. *Id.* at 381. Further, because Appellants provided no evidence concerning the uses and physical characteristics of the areas of City Island subject to long-term leases for commercial activities, the District Court did not consider Appellants' challenge to the provision prohibiting literature distribution in those areas. *Id.* at 388. The District Court also found that Appellants lacked standing to challenge the section's prohibition on blocking the entrance or exit from any park, commercial business or commercial activity and the requirement that leafleteers stand on the grass off the walkways while distributing literature and keep moving on while on the walkways because they had never been cited or arrested for a violation of §10-301.30. *Id.* Finally, Appellants' challenge to the City's application of Pennsylvania's Disorderly Conduct statute failed because the District Court credited the testimony of the defense in determining that Appellants had gone beyond legitimate First Amendment activity. *Id.* at 390 (citing *Commonwealth v. Gowan*, 399 Pa.Super. 477, 481 (1990)("the exercise of free speech can go beyond constitutionally

8

protected boundaries to the realm of prohibitive and criminal behavior.")).

Appellants now challenge the District Court's denial of injunctive relief[*] with regard to the remaining portions of the City Ordinance and the application of the Pennsylvania Disorderly Conduct statute.

III.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).  We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

We review the denial of injunctive relief for abuse of discretion.  *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); s*ee also Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 89 n.1 (3d Cir. 2000).  The standard for permanent injunctive relief was set out in *Roe v. Operation Rescue*, 919 F. 2d 857, 867 n.8 (3d Cir. 1990)(quoting *Northeast Women's Center, Inc. v. McMonagle*, 665 F.Supp. 1147, 1152-53 (E.D.Pa. 1987)): "First, the plaintiff must demonstrate that the court's exercise of equity jurisdiction is proper.  Second, the plaintiff must actually succeed on the merits of its claims.  Third, the plaintiff must show that the balance of equities tips in favor of injunctive relief."  In demonstrating that the court's exercise of equity jurisdiction is proper, the "plaintiff must show that: (1) he has no adequate legal remedy; (2) the threatened injury is real, not imagined; and (3) no equitable defenses

---

[*]The parties agreed, after completion of a preliminary injunction hearing, that the District Court could decide the merits of a permanent injunction based on the evidence presented at the hearing.

9

exist." *Id.*

IV. DISCUSSION

A. Challenge to the Harrisburg City Ordinances

Whether the permitting ordinances are facially constitutional turns on the justification for requiring a permit and providing for exclusive use of an area once a permit is obtained. If this method of allocating the use of City parks is determined by the identity of the groups seeking use or the content of their message, the provisions should be struck down. But if, as the District Court found, the provisions were designed in a content-neutral fashion with the aim of facilitating orderly and efficient use of the parks, then the provisions should stand as acceptable time, place and manner restrictions, even if some First Amendment activity is inadvertently affected by the provisions.

Section 10-301.22 provides the standards for the Park Director's issuance of a permit. In line with the written guidelines, the testimony of Park Director Tina Manoogian-King confirms that her understanding of her role in reviewing applications for permits comports with the criteria set out in the ordinance. Tr. 109. She noted that with respect to her obligation to issue a park permit when requested, she has a responsibility to "ensure that the proposed activity will not unreasonably interfere with or detract from the public's enjoyment of the park[,] . . . will not interfere or unreasonably detract from the public's health, welfare, safety and recreational opportunities[,] . . . will not result in violence, criminal activity or disorderly conduct[, or] . . . cause any extraordinary,

10

burdensome financial obligations on the City of Harrisburg." Id. "I need to make sure that the facilities are available and not already committed to other organizations for specific time frames on specific dates in specific areas of our park system. . . . I have no other discretion." *Id*. at 109-10.

The Supreme Court found that the government has a substantial interest in "coordinat[ing] multiple uses of limited space" which implicates a permittee's interest in the use and enjoyment of that space. *Thomas*, 534 U.S. at 332. In *Thomas*, the Chicago Park District adopted an ordinance which required a person to obtain a permit in order to "conduct a public assembly, parade, picnic, or other event involving more than fifty individuals," or engage in an activity such as "creat[ing] or emit[ting] any Amplified Sound." *Id.* at 318. The permit statute in *Thomas* was substantially similar to that challenged herein, as were the thirteen specified grounds for rejection of a permit under the Chicago Park District ordinance. *See Thomas*, 534 U.S. at 318-19, 319 n.1. The Court noted that "the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event." *Id*. at 322.

In assessing the appropriateness of the permitting scheme as a time, place, and manner regulation, the Supreme Court noted that "even content-neutral time, place, and

11

manner restrictions can be applied in such a manner as to stifle free expression" where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit. *Thomas*, 534 U.S. at 323 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). Thus, the regulation in question must contain adequate standards to guide the official's decision and render it subject to effective judicial review. *Id.*

The District Court noted, and we agree, that *Thomas* upheld criteria substantially similar to those in section 22 of the Harrisburg City Ordinance. *Diener*, 232 F.Supp.2d at 378. The City's interest in allowing the permittee unfettered use and enjoyment of a particular area is substantial for the very reasons which comprise the criteria set out by the ordinance and recounted by Manoogian-King. That is, the City has a substantial interest in ensuring that the public's health, welfare, safety or enjoyment of the park will not be compromised by a proposed use of the park. Accordingly, any proposed event that might result in violence, criminal activity or disorderly conduct should be denied a permit, as should any event which poses extraordinary, burdensome financial obligations on the City of Harrisburg. Important aspects of the criteria in *Thomas* included that the Park District could deny a permit only for one or more of the reasons set forth in the ordinance, that the Park District was required to process the applications with 28 days and clearly explain its reasons for denial, and that an appeals process was available. *Id.* at 324. The reasons for denial set out in the *Thomas* statute, like those set out in the Harrisburg ordinance, mirrored the considerations which justified the permitting scheme in the first place. A

12

permit application could be denied, for example, when the application was incomplete or contained a material falsehood or misrepresentation, when the applicant had damaged Park District property on prior occasions and had not paid for the damage, when a permit had already been granted to another applicant for the same location at the same time and date, or when the intended use would present an unreasonable danger to the health or safety of park users. *Id.*

The Supreme Court addressed the propriety of a permit-holders' ability to exclude whomever they choose from permitted events in a unanimous decision in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, etc., et al.*, 515 U.S. 557 (1995). In *Hurley*, a group of gay, lesbian, and bisexual descendants of Irish immigrants ("GLIB") challenged their exclusion from a St. Patrick's Day parade. *Id.* at 561.[**] The

---

[**]We note that in *Hurley*, only the parade council, not the interposing group, presented the Supreme Court with a First Amendment claim. As the Sixth Circuit found in *Sistrunk v. City of Strongsville*, however, "the similarity between the facts in *Hurley* and the facts in the present case strongly suggests that the city could not have required the committee to include in the rally persons imparting a message that the committee did not wish to convey." 99 F.3d 194, 198 (6th Cir. 1996). In *Sistrunk*, the Sixth Circuit followed the *Hurley* ruling, holding that where attendees of a political rally held by permit on a traditional public forum were prohibited from exhibiting messages contrary to the aims of the sponsors of the event, no violation of complainants' First Amendment rights occurred. 99 F.3d at 200. Like the Supreme Court in *Hurley*, the Sixth Circuit found fatal to plaintiff's claim the lack of any allegation that the city's permitting process was content-based (i.e., that plaintiff did not allege that she applied for permission to hold a rally for her own expressive purposes in the Commons and was denied permission on the basis of the content of her views) and the possibility that she could have held her own event to promote her views in another place or on another day. *Id.* at 199. "Just as the organizers of the parade could not be compelled to include in their message the discordant message of GLIB, the committee that organized the rally for George Bush could not be compelled

13

Court held that to require the organizers of the parade to include GLIB, or any other group which promoted a message that the organizers did not wish to endorse, would be "essentially requiring petitioners to alter the expressive content of their parade." *Id.* at 572-73. In this analysis the Court wrote that forcing the organizers to include undesired messages in their efforts would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. The ability of permit-holders to exclude unwelcome participants under the Harrisburg permitting scheme similarly ensures that event organizers are able to determine the content of their message or event. The exclusivity aspect of the scheme also serves the function of facilitating one of the fundamental objectives of the permitting scheme, i.e., maintaining public order in the use of City parks.

Another important similarity between this case and *Hurley* is the existence of ample alternative opportunities for expression on the part of the excluded groups. *Id.* at 578 ("Considering that GLIB presumably would have had a fair shot (under neutral criteria developed by the city) at obtaining a parade permit of its own, respondents have not shown that petitioners enjoy the capacity to 'silence the voice of competing speakers.'"). Here, Appellants have never applied for, much less been denied, a permit by the City of Harrisburg. Rather, the testimony indicates that had they applied, the permit

to include in its message an expression of confidence in Clinton." *Id.*

14

would have been granted as long as no request had been previously approved for the same place and time. Further, the testimony also indicates that petitioners would have been free to express their views outside the permitted areas as long as their behavior in doing so did not constitute disorderly conduct as discussed below.

The Harrisburg City permitting scheme challenged by Appellants survives a facial challenge because the provisions are content-neutral time, place, and manner restrictions and are narrowly-tailored to serve a significant governmental interest. Similarly, the grant of exclusivity provided to permit-holders through the ordinance is also an appropriate measure designed to foster, rather than restrict First Amendment activity. The as-applied challenge to these provisions also fails because, as discussed more fully below, any exclusion of Appellants that occurred was content-neutral, based on their behavior, not the content of their speech.

B.      Challenge to Pennsylvania Disorderly Conduct Statute

Whether a defendant's words or acts rise to the level of a violation of the Pennsylvania Disorderly Conduct statute, 18 Pa. Cons. Stat. Ann. § 5503(a), hinges upon whether those words or acts "cause or unjustifiably risk a public disturbance." *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa. 1999).

The District Court made a factual finding that the police were not excluding the Appellants based on the content of their speech at any of the events. *Diener*, 232 F.Supp.2d at 389. We review the District Court's findings of fact for clear error. *See, e.g.,*

15

*Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995).

Appellants argue that the District Court improperly dispensed with their claim of unconstitutional application of the disorderly conduct statute with respect to the June 9, 2000 arrests. Appellants' Br. At 21. As stated by Appellants in their brief, however, Sheri Sucec and Jeff Mayon were charged with Disorderly Conduct under § 5503(a)(1). *Id.* The Pennsylvania Supreme Court has held that approaching someone and screaming threats violates the Disorderly Conduct statute. *See Commonwealth v. Mastrangelo*, 414 A.2d 54, 58 (Pa. 1980); *cf. Commonwealth v. Lutes,* 793 A.2d 949, 963 (Pa. Super. 2002) (where defendants approached county commissioner outside public courthouse, threatened him and invited him to fight, this violated the statute). Appellants attempt to distinguish *Mastrangelo*, arguing that an actor must intend to threaten in order to violate the statute and that they lacked such an intent. The courts in *Mastrangelo* and *Gowan*, however, did not require that the actors intend to be threatening, but merely that they intend to cause inconvenience or annoyance. *See Mastrangelo,* 414 A.2d at 57-58 (stating that the statute prohibits one from intentionally or recklessly making unreasonable noise); *Commonwealth v. Gowan*, 582 A.2d 879, 882 (Pa. Super. 1990) ("when a protected first amendment right to free speech is implicated, it is necessary that the actor *intend* to breach the public peace by making unreasonable noise"). Here, the District Court implicitly found that Appellants intended to breach the peace and cause inconvenience or annoyance. The District Court's finding that Appellants violated the statute by moving

16

toward the Mayor and the museum director and shouting was not clearly erroneous.

Appellants' challenge to the July 29, 2000 arrest of Stephen Garisto under § 5503(a)(2) for unreasonable noise and § 5503(a)(4) for creating "a hazardous or physically offensive condition by any act that serves no legitimate purpose of the actor" similarly fails. Testimony presented concerning this incident supports the District Court's determination that this arrest was based on the arrestee's behavior in trying to push past the citing officer.

The District Court found that with respect to the October 7, 2000 incident, Young refused to stop shoving his tape recorder into people's faces and refused to leave the area after police requested that he do so. Tr. 205. This finding was not clearly erroneous. Forcibly entering or remaining in an area in which one is unwelcome after the police have requested that the person leave may create a hazardous condition and reflect an intent to cause public inconvenience, annoyance or alarm. *See Commonwealth v. Roth*, 531 A.2d 1133, 1137 (Pa. Super. 1987)(group of protestors who marched to church and attempted to enter against church members' wishes and after being warned to leave were properly convicted of disorderly conduct for creating a hazardous condition under § 5503(a)(4)); *cf. Commonwealth v. DeLuca,* 597 A.2d 1121 (Pa. 1991)(in response to officer's request not to leave the scene, individual resisted by screaming at the officer to get out of the way, using obscene language and pushing the officer's hands away, creating risk of public alarm, annoyance or inconvenience).

17

Finally, the Appellants' physical resistance of the police directives served no legitimate purpose. While the Appellants had the right to speak, and the police may have even erred by failing to admit them to certain events, an individual's belief that a police officer is wrong does not afford him a legitimate basis to physically resist the officer's order. As the court recognized in *Roth*, the defendants' attempt to enter the church and cause a disruption was not a legitimate purpose, even if their preaching on the sidewalk was protected. *Roth*, 366 A.2d at 588. While speech may be protected, an individual's choice to disobey police orders is not. Accordingly, the District Court's conclusion that the Disorderly Conduct statute was not unconstitutionally applied should be affirmed.

In their challenge to the July 28, 2001 arrests, Appellants claim that "even if the court were to credit the testimony of the defense witnesses, the facts do not justify the arrests." Appellants' Br. at 27. Appellants point out that in *Commonwealth v. Gowan*, the court held that when preachers waved their arms and yelled so loudly that they could be heard 150-200 feet away, this did not establish "unreasonable noise" beyond a reasonable doubt so as to violate the Disorderly Conduct statute. 582 A.2d 879, 881-82 (Pa. Super. 1990). The *Gowan* court recognized, however, that this is a very fact-based inquiry. While it might not have been unreasonably loud for the preachers to yell and perhaps even use a megaphone, the additional noise created by a drum might rise to a level considered unreasonable, especially since it was being beaten under the window of a residential complex. *Cf. Commonwealth v. Wiener*, 326 A.2d 896 (Pa. Super. 1974)

18

(under former disorderly conduct statute, holding that use of loudspeaker in residential area by group of protestors could constitute disorderly conduct). Moreover, although Appellants point out that there was a rock band playing in the park, the area in which the conduct in question occurred was further removed from the event, in the midst of a residential area. In fact, it was a complaint from one of the residents about the drum that prompted the officer to ask Diener to stop playing. *Id.*

When the other individuals arrested on that date began screaming at police through the megaphone following Diener's arrest, that behavior also violated the Disorderly Conduct statute. As the *Gowan* court stated, "In assessing the effect of constitutionally protected activity such as preaching, it is clear that the same level of loudness or 'noise,' in conducting an activity which must be tolerated or accepted, would be unacceptable if the party were conducting unprotected activity such as inciting to riot *or harassing the police in their law enforcement function.*" *Gowan*, 582 A.2d at 882 (emphasis added). The District Court's finding that the arrests of Diener, Smith and Storms on July 28, 2001 were proper applications of the Disorderly Conduct statute is therefore supported by both governing law and the record.

V. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.

19

TO THE CLERK:

Please file the foregoing opinion.

By the Court,

 /s/  D. Brooks Smith
Circuit Judge

DATED: October 10, 2003