**VICTORY OUTREACH CENTER, et al.**

v.

**Sergeant MELSO, et al.**

**No. CIV.A.00–5185.**

United States District Court, E.D. Pennsylvania.

March 22, 2004.

J. Michael Considine, Jr., West Chester, PA, for Plaintiffs.

Elizabeth S. Mattioni, Deputy City Solicitor, Law Department, Philadelphia, PA, David P. Karamessinis, William J. Devlin, Jr., Devlin & Devine, Conshohocken, PA, for Defendants.

### MEMORANDUM AND ORDER

HUTTON, Senior District Judge.

Presently before the Court are Plaintiffs' Motion for Summary Judgment (Docket No. 64), Defendants the City of Philadelphia, Sergeant Joseph Melso, Police Officer Jason Parker, Police Officer James Cullen, and Police Officer Eric Fredericksdorf's Opposition to Plaintiffs' Motion for Summary Judgment and Municipal Defendants' Cross–Motion for Summary Judgment (Docket No. 68), and Plaintiffs' revised reply thereto (Docket No. 73).

### I. BACKGROUND

Plaintiffs C. Stephen White ("White") and Victory Outreach Center [1] filed the

---

1. The name "Victory Outreach" was changed to the "Philadelphia Gospel Outreach Cen-

instant suit against Defendants Police Officer James Cullen ("Cullen"), Police Officer Jason Parker ("Parker"), Sergeant Joseph Melso ("Melso"), Police Officer Eric Fredericksdorf ("Fredericksdorf"), the City of Philadelphia ("City" or "Philadelphia") (collectively "the Municipal Defendants"), and St. Joseph's University, alleging infringement of White's First and Fourth Amendment rights pursuant to 42 U.S.C. § 1983.

This suit revolves around three incidents, two of which occurred during the Greek Picnics on July 24, 1999 and July 9, 2000, and the third at St. Joseph's University on March 15, 2001.

Plaintiff White is a minister and evangelist who believes that it is his mission to bring his message of the gospel to college students on campuses in the Philadelphia area and at the annual Greek Picnic. According to White, the Greek Picnic is a predominantly African–American event involving college students that takes place in Philadelphia every July. After the picnic, the celebrants "descend down to South Street," where the crowds can grow to "25,000 people there all over South Street, [and] all up and down Broad Street." C. Stephen White Dep., May 19, 2001, at 15 (Docket No. 69, Ex. A) [hereinafter "White I"].

### A. July 24, 1999 Incident at Greek Picnic

On the night of Saturday, July 24, 1999, White traveled to South Street to "preach the word of God" to the predominantly African–American Greek Picnic crowd of teens and college age individuals gathered in the South Street corridor. *Id.* at 16 (Docket No. 69, Ex. A). White brought with him a four foot by six foot banner that read "Fornicators and drunkards will join Tupac in hell. Obey Jesus. I Corinthians 6:9." *Id.* at 17–18. The banner was to be attached to an eight foot high pole, which White would then attach to his waist and carry like a flag.

The South Street corridor was a "madhouse. It was so packed with people." *Id.* at 20. White parked his car around Fifth Street and walked down to Second Street. Due to the large crowd in the area, it took White ten minutes to walk from Fifth Street to Second Street. When he arrived at the intersection of Second and South Streets, White unfolded the banner and hoisted it up. The crowds forced White onto Second Street.

Standing on Second Street, White began to preach and "reiterat[ed] what the banner said." *Id.* at 41. According to White, he was speaking a little bit louder than normal and ten to twenty individuals gathered around him out of curiosity. About five individuals from the crowd engaged him in conversation. The police asked White to "move on or ... be arrested" only once while he was on Second Street. *See* White I Dep., at 44. After that, White contends that the police "went hysterical" and thought the crowd was "hostile and erratic." *Id.* at 44–45. White contends that he didn't sense that from the crowd. White refused to move and the police subsequently arrested him.

According to Officer Parker, he saw White walking down Second Street with the banner and yelling into the crowd. Officer Parker observed approximately fifty to sixty individuals, mostly African–Americans in their twenties, around White. White's "preaching ... caused a large crowd to gather, very loud and boisterous, and [White] was blocking the passageway of the sidewalk." Jason Parker Dep., at 28 (Docket No. 69, Ex. D); *see also* James Cullen Dep., at 14 (Docket No. 69, Ex. C) ("I heard people complaining within the

ter." The entity is an inner-city mission and      White is currently its sole employee.

crowd in reference to the sign ... they were basically upset about the sign."). White "incited the crowd, refused to move, blocked the pavement and made it unsafe for police, himself and other people out there." Cullen Dep., at 30 (Docket No. 69, Ex. C). Officer Parker asked White to continue his activities at another location to relieve the congestion. White did not move. Officer Parker, fearing the situation could turn into something violent, then arrested White for disorderly conduct under 18 Pa. Cons.Stat. Ann. § 5503.

At a hearing held that same night, White was found guilty of disorderly conduct. White appealed and the charges against him were later dismissed.

### B. July 9, 2000 Incident at Greek Picnic

The next year, on July 9, 2000, White went to a second Greek Picnic to spread his message. Because the traffic around the South Street corridor was "so bad," White traveled to Broad and Diamond Streets, another location where Greek Picnic participants gathered. White walked to the McDonald's restaurant on 2100 North Broad Street, stood on a chair, and began preaching.

According to White, he only preached for about two minutes before he was arrested. During those two minutes, approximately ten individuals gathered around him but no one engaged him in conversation. White maintains that he never told the crowd that "Tupac was dead in hell" and that the police only asked him to move from his position "probably once," to which White responded that he had the First Amendment right of freedom of speech. See White I, at 60 (Docket No. 69, Ex. A).

Sergeant Melso was assigned to patrol the area around Broad and Diamond Street during this Greek Picnic celebration. According to Sgt. Melso, White stood on a folding chair and was yelling into the crowd of approximately seventy individuals that had gathered around him. As Sgt. Melso approached the McDonald's restaurant, White started to get louder. Sgt. Melso asked White to move because White was blocking the pavement. At that point, White "started yelling the Tupac Shakur thing was dead and burning in hell inciting the crowd up." See Joseph Melso Dep., at 30 (Docket No. 69, Ex. D). "[T]he crowd was primarily African–American. When [White] started saying Tupac Shakur was dead in hell the crowd start[ed] yelling back at him." Id. at 35.[2] Sgt. Melso was also concerned that "people couldn't get through the crowd [and] would have to walk out into the street to get around [White]." Id. at 37. Concluding that the situation could potentially lead to a riot, and after asking White to relocate five times with no result, Melso arrested White for obstruction of highways and other public passages, in violation of 18 Pa. Cons.Stat. Ann. § 5507.

### C. March 15, 2001 Incident at St. Joseph's University

White also preached at local college campuses such as the University of Pennsylvania, Temple University, and Drexel University. On March 14, 2001, White preached at St. Joseph's University, a Catholic school, for the first time. White stood on the "main concourse" along City Line Avenue and addressed the students. On that day, White claims that approximately forty students and other individuals gathered around him. Because there had

---

**2.** According to Sgt. Melso, Tupac Shakur is a "very well respected person within the Afri-
can–American community." Id. at 62.

been complaints what White was "offending students," the police were called and asked White to move on. *See* White Dep., June 27, 2003, at 72 (Docket No. 69, Ex. B) [hereinafter "White II"]. After speaking to the police, and because it was getting late in the day, White agreed to leave.

White returned to the main concourse of St. Joseph's University the next day, on March 15, 2001. In his first deposition, White states that about ten students assembled around him. *See* White I, at 82–84. In his second deposition, White states that no one gathered around him and that approximately four to five students listened to him from a distance. *See* White II, at 82. While preaching, White used physical gestures that included bending down and lunging forward. *See* White II, at 43–44, 79–80; Ex. 1 of White II (Docket No. 69, Ex. B). Approximately half an hour later, Officer Fredericksdorf approached White and asked White to move to another location by a parking lot. According to White, Officer Fredreriksdorf stated that there were complaints that White was offending students and asked White to move or be arrested. In response, White stated that he prayed and believed that he needed to continue preaching at the same location. *See* White II, at 88. At that point, White was placed under arrest.

According to Officer Fredericksdorf, on March 15, 2001, about twenty to twenty-five individuals were assembled near White. White was preaching and "yelling something about the girls were Catholic whores." *See* Eric Fredericksdorf Dep., at 48 (Docket No. 69, Ex. F). Some students shouted back at White in response. Officer Fredericksdorf also observed that White was blocking the sidewalk and that individuals were "entering the street to circumvent" White. *See* Fredericksdof

Dep., at 44–45. Further, the Officer saw a lot of cars stopping in the middle of the street to observe White instead of the traffic pattern. Officer Fredericksdorf concluded that this was an unsafe situation and asked White to continue preaching at a "location more advantageous for public safety." *See* Fredericksdorf Dep., at 88. When White refused, Officer Fredericksdorf arrested White for obstructing the highway and public passageways, in violation of Pa. Cons.Stat. Ann. § 5507.

### D. First Amendment Training in the Police Department

Police recruit training at the Philadelphia Police Department consists of fourteen hundred hours over a ten month period. Of those hours, about two hours are devoted to teaching recruits about the First Amendment.[3]

In 1995, the City of Philadelphia implemented the First Amendment Lesson Plan in accordance with an agreement to settle the matter of *Lickteig v. Landauer,* Civil Action No. 91–1843. The framers of the *Lickteig* settlement, including White's counsel, drafted a Basic Outline of First Amendment Law ("Basic Outline"). A copy of the Basic Outline is given to each police recruit and the *Lickteig* settlement is referred to in First Amendment recruit training. The City's First Amendment Lesson Plan is in addition to Pennsylvania's required Civil and Criminal Liability course, which also includes information on First Amendment law.

Additionally, the Police Department implemented Directive 94 in June 1999. Directive 94 and its Appendix A address "street speeches and meetings." *See* Phila. Police Dept. Directive 94 (Docket No. 69, Ex. H). Specifically, the Directive rec-

---

**3.** In contrast, about fourteen hours is spent teaching about search and seizure. *See* Ar-

thur Grover Dep., at 26 (Docket No. 69, Ex. G).

ognizes an individual's right to make a speech in a public location subject to certain limits, while at the same time protects the general public safety. *See* Phila. Police Dept. Directive 94, Appendix A (Docket No. 69, Ex. H). A copy is distributed to all police officers.

The Police Department also provides existing officers with yearly in-service training pursuant to state law. Although Pennsylvania did not mandate First Amendment training to existing officers during the period 1995 through August 2001, the City incorporated First Amendment training beginning in 1995. Further, the City taught First Amendment Law to all police officers in the year 2000 and provided a hand-out to all officers. Officers who were assigned to the Republican National Convention were provided with additional First Amendment training.

Sgt. Melso received First Amendment training consistent with Directive 94 at the Philadelphia Police Academy and during in-service update training. Police Officers Cullen, Parker, and Fredericksdorf received First Amendment training consistent with Directive 94 and the Basic Outline of First Amendment law.

On October 12, 2000, White initiated this suit against the Municipal Defendants. On November 28, 2001, White was granted leave to amend his complaint to add St. Joseph's University as a party. In Count I, White alleges a federal civil rights claim for false arrest under the First and Fourth Amendments against Sgt. Melso and Officers Cullen, Fredericksdorf, and Parker. In Count II, White brings a claim for failure to train against the City of Philadelphia under the First and Fourth Amendments. And in Count III, White brings a malicious prosecution claim against the Municipal Defendants. Both White and the Municipal Defendants now move for summary judgment on all counts.

## II. *LEGAL STANDARD*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file showing a genuine issue of material fact for trial. *See id.* at 324, 106 S.Ct. 2548. The substantive law determines which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then there is a genuine issue of material fact. *See id.*

When deciding a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. *See id.* Nonetheless, a party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *See Trap Rock Indus., Inc. v. Local 825,* 982 F.2d 884, 890 (3d Cir.1992).

## III. COUNT I: SERGEANT MELSO AND OFFICERS CULLEN, FREDERICKSDORF, AND PARKER

In order to maintain a civil rights cause of action under 42 U.S.C. § 1983, a plaintiff must prove that (1) he was deprived of rights, privileges or immunities secured by the Constitution or laws of the United States due to (2) the conduct of a person acting under color of state law.[4] *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 is not, by its own terms, a source of substantive rights. Instead, it provides a remedy for deprivations of rights that are established elsewhere in the Constitution or the federal statutes. *See Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996).

### A. Fourth Amendment Claims

White argues that he was falsely arrested because the Police Officers did not have sufficient probable cause to arrest him during each of the three incidents. The Officers counter that there was probable cause to arrest White.

Under the Fourth Amendment, a police officer cannot arrest a citizen without probable cause. *See Paff v. Kaltenbach,* 204 F.3d 425, 435 (3d Cir.2000). Probable cause exists when, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person's belief that a suspect was committing an offense. *See Johnson v. Campbell,* 332 F.3d 199, 211 (3d Cir.2003); *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995); *United States v. Glasser,*

750 F.2d 1197, 1205 (3d Cir.1984). "Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." *Orsatti,* 71 F.3d at 482–83.

Probable cause is a factual analysis from which the officers on the scene must make an immediate determination. *See Glasser,* 750 F.2d at 1206. It is the function of the courts to determine whether the objective facts available to the officers, at the time of the arrest, were sufficient to justify a reasonable belief that an offense was being committed. *See id.* As a general matter, the question of probable cause in a § 1983 damage suit is one for the jury. *See Montgomery v. DeSimone,* 159 F.3d 120, 124 (3d Cir.1998). However, a district court may conclude "that probable cause exists as a matter of law if the evidence, viewed most favorably to [the non-moving party], reasonably would not support a contrary factual finding," and may enter summary judgment accordingly. *Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir.1997).

### 1. July 24, 1999 Incident

On July 24, 1999, White was arrested for disorderly conduct in the South Street area. The Pennsylvania disorderly conduct statute, 18 Pa. Cons.Stat. Ann. § 5503(a), provides that:

A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in fighting or threatening, or in violent or tumultuous behavior; (2) makes un-

---

4. 42 U.S.C. § 1983 provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States

or other person within the jurisdiction thereof to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

reasonable noise; (3) uses obscene language, or makes an obscene gesture; or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

Under the statute, "whether a defendant's words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." *Commonwealth v. Hock,* 556 Pa. 409, 728 A.2d 943, 946 (1999). "The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder." *Id.* (quoting *Commonwealth v. Greene,* 410 Pa. 111, 189 A.2d 141, 144 (1963)). However, it need not be shown that "any specific persons of the general public were actually disturbed." *Russoli v. Salisbury Township,* 126 F.Supp.2d 821, 845 (E.D.Pa.2000) (citing *Basista v. Weir,* 340 F.2d 74 (3d Cir. 1965)).

Plaintiff contends that Police Officers Cullen and Parker had no probable cause to arrest him for disorderly conduct. Specifically, White contends that he preached for a short period of time, that about ten to twenty individuals gathered around him, and that only about five individuals engaged him in conversation. Further, White contends that he did not sense that the crowd was becoming "hostile and erratic" in response to his statements about Tupac Shakur. Under these circumstances, White contends there was no probable cause to make out a violation for disorderly conduct.

Officers Cullen and Parker paint a very different picture of that evening. According to the Officers, White's "yelling" attracted a "loud and boisterous" crowd of about fifty to sixty individuals and blocked the sidewalk. Unlike the relatively calm conversation portrayed by White, the Officers both felt that the crowd was getting upset at White and that the situation could quickly degenerate into something even more chaotic. According to Officer Cullen, individuals were "yelling and screaming in his direction." Cullen Dep. at 23. Officer Parker testified that he asked White to move to another location "numerous times" but White refused each time. *See* Parker Dep. at 29. Under these circumstances, Officer Parker contends that there was sufficient probable cause to arrest White for disorderly conduct.

The scenarios portrayed by White and Officers Cullen and Parker demonstrate that there is a genuine issue of material fact preventing the Court from granting summary judgment to either party. Considering Defendants' motion for summary judgment and viewing the evidence in the light most favorable to Plaintiff White, the Court cannot conclude that a reasonable jury could only find that the Officers had probable cause to arrest White. Similarly, if the evidence is viewed in the light most favorable to the Defendants, as required when considering Plaintiff's motion for summary judgment, the Court finds that a reasonable jury could conclude that there was sufficient probable cause to arrest White.

### 2. *July 9, 2000 Incident*

At the next year's Greek Picnic, White was arrested in front of McDonald's for violation of 18 Pa. Cons.Stat. Ann. § 5507(a). The statute defines obstructing highways and other public passages as follows:

(a) Obstructing.—A person who, having no legal privilege to do so, intentionally or recklessly obstructs any highway, ... sidewalk, ... [or] other public passage ... commits a summary offense, or in case he persists after warning by a law officer, a misdemeanor of the third degree. No person shall be deemed guilty of an offense under this subsection sole-

ly because of a gathering of persons to hear him speak or otherwise communicate, or solely because of being a member of such gathering.

18 Pa. Cons.Stat. Ann. § 5507(a).

Again, White and the Police Officers present widely diverging views of the events. Under Plaintiff's account, White stood on a chair and preached for about two minutes in front of the McDonald's on Broad Street. During the two minutes, about ten individuals gathered around him and no one engaged him in conversation. White also maintains that there was plenty of room for pedestrian passage and therefore, he was not obstructing the sidewalk. Moreover, White denies that he told the crowd that "Tupac was dead in hell."

In contrast, Sgt. Melso described White as yelling into the crowd of about seventy individuals that had gathered around White. As Sgt. Melso approached White, White apparently started to yell that "Tupac ... was dead and burning in hell." At that point, the crowd started to get angry and yell back at White. Sgt. Melso was concerned that the crowd was "going to go after" White and that many individuals were forced to walk into the street to get around the situation. See Melso Dep., at 35, 37 (Docket No. 69, Ex. E). After White refused Sgt. Melso's repeated requests to move, Sgt. Melso arrested White.

Under these diverging accounts of the same incident, the Court finds that a disputed issue of material fact exists that prevents the Court from granting summary judgment to either party.

### 3. March 15, 2001 Incident

White's preaching at St. Joseph's University also raises genuine issues of material fact. On March 15, 2001, after preaching for about thirty minutes, White was again arrested for obstructing highways and other public passageways in violation of 18 Pa. Cons.Stat. Ann. § 5507(a). The parties dispute the manner in which White was preaching, the size of the crowd that listened to White, the response from the crowd, the ability of pedestrians to pass by White, and the street traffic patterns occurring as a result of White's preaching.

Under these circumstances, the Court denies Plaintiff's motion for summary judgment as to violations of his Fourth Amendment rights and also denies Municipal Defendants' cross-motion for summary judgment as to violations of White's Fourth Amendment rights in their entirety.

### B. First Amendment Claims

The First Amendment protects speech and other expressive activity in public places. See Diener v. Reed, 232 F.Supp.2d 362, 375 (M.D.Pa.2002) (citing Kreimer v. Bureau of Police, 958 F.2d 1242, 1255–56 (3d Cir.1992)), aff'd by No. 03–1405, 77 Fed.Appx. 601, 2003 WL 22326515 (3d Cir. Oct.10, 2003). For example, "[s]tanding on a sidewalk or in a public place reading from the bible and expressing dissatisfaction with the status quo are constitutionally protected exercises of free speech." Commonwealth v. Gowan, 399 Pa.Super. 477, 582 A.2d 879, 881 (1990).

However, the freedom of speech "is not absolute at all times and under all circumstances." See J.S. v. Bethlehem Area School District, 569 Pa. 638, 807 A.2d 847, 854 (2002) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)); see also Johnson, 332 F.3d at 212. Speech that is likely to inflict unacceptable harm may be regulated. See J.S., 807 A.2d at 854. This narrow category of unprotected speech includes "fighting word," speech that incites others to imminent lawless action, obscenity, certain types of defamatory speech, and "true threats." See id.; Chaplinsky, 315 U.S. at 568, 62 S.Ct. 766 (fighting words);

*Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (speech that incites); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscenity); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (defamatory speech); *Watts v. United States* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) ("true threats").

▮ "Fighting words" are words that "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Commonwealth v. Hock,* 556 Pa. 409, 728 A.2d 943, 946 n. 3 (1999) (quoting *Commonwealth v. Mastrangelo,* 489 Pa. 254, 414 A.2d 54, 58 (1980)); *see Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766. The circumstances surrounding the words are crucial in determining whether words constitute "fighting words." *See Hock,* 728 A.2d at 946. The words must "do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'" *Johnson,* 332 F.3d at 212 (quoting *Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). Moreover, "profane" words alone, unaccompanied by any evidence of violent arousal, are not "fighting words" and are therefore protected speech. *See Johnson,* 332 F.3d at 212 (citing *Cohen v. California,* 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)); *see also Brockway v. Shepherd,* 942 F.Supp. 1012, 1017 (M.D.Pa. 1996) ("[S]tanding alone, profane or vulgar language is not itself obscene and does not amount to fighting words.").

▮ Thus, when analyzing First Amendment issues, a court needs to carefully "balance the fundamental right of free speech against the annoyance or inconvenience to other persons." *Gowan,* 582 A.2d at 881. Here, White contends that his preaching at the Greek Picnics and at St. Joseph's University is constitutionally protected speech and thus, his arrest violated his First Amendment rights.

In White's view, he attended each of these events to spread the message of the gospel. In contrast, the Police Officers contend that White's speech went beyond "constitutionally protected boundaries to the realm of prohibitive and criminal behavior." *Id.* Specifically, the Police Officers contend that White was not arrested because of the content of his speech.

Even if White was arrested solely for the words he spoke, the facts do not conclusively demonstrate, one way or the other, that White's words were "fighting words" or words that "incite[d] others to imminent lawless action." *See J.S.,* 807 A.2d at 854. White maintains that he, at no point, felt the crowds at the Greek Picnics were "hostile and erratic" or that the students at St. Joseph's University were offended by his words. White contends that individuals listened without hostility and some even engaged him in conversation. On the other hand, the Police Officers felt that the crowds at the Greek Picnic and St. Joseph's University were getting riled up and shouted back in anger at White in response to his proclamations that "Tupac is dead and burning in hell" or that "Catholic girls were whores." The Police Officers at the Greek Picnics became concerned that the crowd was "going to go after" White. Further, while White contends that his preaching did block the sidewalk, the Police Officers vigorously disagree and contend that White's preaching caused dangerous conditions in congested areas. The Officers maintain that the safety hazard caused by White, and not the content of his speech, were the primary forces behind his arrests.

Because of the parties' widely contrasting descriptions of the same three incidents, the Court finds that there exists genuine issues of material fact and will not grant summary judgment to either party as to this claim. The Court thus denies

Plaintiff's motion for summary judgment as to Count I in its entirety.

### C. *Qualified Immunity*

The Police Officers also argue that even if White were to establish a violation of his Fourth or First Amendment rights, the doctrine of qualified immunity shields them from liability.

Under this doctrine, government officials "performing discretionary functions 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory of constitutional rights of which a reasonable person would have known.'" *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating a claim of qualified immunity, the court conducts a two-step inquiry. First, the court must first determine "whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation." *Douris v. Dougherty,* No. 01–5757, 2003 WL 231258, at *10 (E.D.Pa. Jan.31, 2003) (quoting *Bennett v. Murphy,* 274 F.3d 133, 136 (3d Cir.2002)). Second, if plaintiff's factual allegations establish a constitutional violation, the court must determine whether "a reasonable officer would have known that his actions were not pursuant to law." *Douris,* 2003 WL 231258, at *10 (citing *Bennett,* 274 F.3d at 136).

█ In the context of a claim based on probable cause, qualified immunity shields officers from suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. *See Hughes v. Shestakov,* No. Civ. A. 00–6054, 2002 WL 1742666, at *2 (E.D.Pa. July 22, 2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity. *See id.*

The Third Circuit has recognized that a "tension exists as to the proper role of the judge and jury where qualified immunity is asserted." *Sherwood,* 113 F.3d at 401. Such tension exists because while "the application of qualified immunity is a question of law," the existence of probable cause in a § 1983 action is a question of fact. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see Sherwood,* ·113 F.3d at 401; *Groman v. Township of Manalapan,* 47 F.3d 628, 635 (3d Cir.1995). Further, "resort to a jury is appropriate in deciding the qualified immunity issue" if facts material to the reasonableness of the officer's beliefs and actions are in dispute. *Sharrar,* 128 F.3d at 828.

█ Factual issues exist making summary judgment inappropriate as to the Police Officers' determination of probable cause for White's arrest. These questions, requiring a trier of fact's attention, also prevent summary judgment entitling Officers Cullen, Parker, and Fredericksdorf and Sgt. Melso to qualified immunity. *See Pahle v. Colebrookdale Township,* 227 F.Supp.2d 361, 373 (E.D.Pa.2002) (stating that genuine issues of material fact existed to preclude granting of summary judgment based on qualified immunity); *Russoli,* 126 F.Supp.2d at 844. Accordingly, Defendant Police Officers' motion for summary judgment as to Count I is denied.

### · IV. *COUNT II: CITY OF PHILADELPHIA*

█ A municipality is liable for a constitutional tort only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," inflicts a specific inju-

ry. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1295 (3d Cir.1997) (quoting *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A policy is made when "a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir.1990) (citations omitted)). Under certain circumstances, a municipality is liable for failure to train subordinate officers when the "failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The policy must be the "moving force" behind the constitutional violation. *See Wolf v. Sch. Dist. of Phila.*, No. 01–1183, 2002 WL 1471289, at *4 (E.D.Pa. June 19, 2002) (citing *Canton*, 489 U.S. at 388–89, 109 S.Ct. 1197). Failure to adequately train municipal employees can ordinarily be considered deliberate indifference "only where the failure has caused a pattern of violations, and the need for more or different training is obvious and inadequacy is very likely to result in violation of constitutional rights." *Cavicchia v. Phila. Housing Auth.*, No. 03–0116, 2003 WL 22595210, at *13 (E.D.Pa. Nov.7, 2003).

■ Moreover, a municipality may be "independently liable for a substantive due process violation even in situations where none of its employees are liable." *Brown v. Commonw. of Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir.2003) (citing *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir.1994)). However, for a municipality to be liable, "there still must be a violation of the plaintiff's constitutional rights." *Id.* (citing *Collins v. City of*

*Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). It is not enough that a municipality adopted with deliberate indifference a policy of inadequately training its officers. "There must be a 'direct causal link' between the policy and a constitutional violation." *Id.* (citing *Canton*, 489 U.S. at 385, 109 S.Ct. 1197).

■ In Count II of his Amended Complaint, White alleges that the City of Philadelphia failed to adequately train its police officers regarding First Amendment rights. White argues that "the written materials are adequate except they make no mention of [the obstructing highways and passageways statute] 18 Pa. Cons.Stat. Ann. § 5507, of the requirements under the law to take action to control a crowd and order room for pedestrian passage prior to arrest for public speech resulting in crowd formation, and they make no mention of what specific actions a police officer must take when crowds form in response to speech." Pl.'s Mot. for Summ. J. and Response to Police Def.'s Mot. for Summ. J., at 42 (Docket No. 64). White focuses his attention specifically on 18 Pa. Cons.Stat. Ann. § 5507(b)(2) which states:

> An order to move, addressed to a person whose speech or other lawful behavior attracts an obstructing audience, shall not be deemed reasonable if the obstruction can be *readily* remedied by police control of the size or location of the gathering.

18 Pa. Cons.Stat. Ann. § 5507(b)(2) (emphasis added). White interprets this provision as requiring police officers to uphold the right of the speaker in all instances.

In response, the City contends that it has provided more than adequate training of First Amendment rights to its police officers. The City provides two hours of First Amendment training to new recruits and updates existing officers about First

Amendment issues through its yearly in-service training. All Philadelphia police officers receive a Basic Outline of First Amendment Outline. In a section entitled "Basic Law: Restriction of Free Speech," the Outline instructs, in pertinent part, that:

1. Freedom of speech is not absolute
   . . . .
2. Restrictions on Speech Within Public Forum Areas

   A. Reasonable time, place and manner restrictions may be placed on expressive activity so long as the restrictions focus on the evils the government seeks to eliminate without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils.

   (1) Police may have authority to minimize conditions which significantly impair public safety with respect to pedestrian or vehicular traffic.

   (2) The First Amendment means that the government or police officers have no power to restrict expression because of its message, its ideas, subject matter or content.

   B. Generally, police officers may not tell individuals in public forum areas that expressive activity is illegal, require people to move, or require that expression take place at another location, unless certain circumstances exist such as criminal activity, violence or disorderly conduct, or impairments of public safety.

   (1) Depending on the overall circumstances of a situation, police may or may not have discretion to force an individual to move from the site of significant contact with the public, for example, a busy public sidewalk, to a place of less significant contact, for example, a side-walk with less pedestrian traffic. The overall circumstances affect police discretion and all factors must be considered.

*See* Phila. Police Basic Outline of First Amendment Law (Docket No. 64, Ex. 13).

Additionally, all police officers receive a copy of Directive 94, which concerns the procedure for processions, parades, marches, or races, and its Appendix A, which specifically addresses "street speeches and meetings." Appendix A states, in part,

I. [E]very citizen is free to make a speech on any lawful subject to a public gathering. . . .

   A. Such speeches when made on sidewalks . . . and other similar areas do not require a permit. Persons carrying banners are not required to move about, provided they are not impeding the movement of pedestrian or vehicular traffic. . . .

   B. However, unusually large crowds may require the services and protection of police. . . . Passing pedestrians should have free access of the sidewalk and not have to walk around the crowd and into the street. It is the duty and responsibility of police personnel to protect the basic right of free speech and lawful assembly, to protect the rights and safety of the public and to prevent any acts of violence.

Phila. Police Dept. Directive 94, App. A (Docket No. 69, Ex. H).

The record thus provides ample evidence of the City's training of officers with respect to balancing the First Amendment right of freedom of speech against concerns of public safety. Although these teachings do not explicitly refer to 18 Pa. Cons.Stat. Ann. § 5507(2), they implicitly account for it by requiring all police officers to protect an individual's right to free

speech unless the safety of the public is threatened. Police officers often face rapidly evolving situations which require them to use their judgment and discretion, coupled with their knowledge of First Amendment issues, in light of all of the information available to them at the time. This may lead officers to conclude that public safety is impaired, whether because pedestrians' access to sidewalks is obstructed or whether actual violence erupts or is about to erupt. As courts have previously recognized, the freedom of speech "is not absolute at all times and under all circumstances." *See J.S.*, 569 Pa. at 650, 807 A.2d 847 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766 (1942)). Moreover, even if the Police Officers were mistaken in their judgment, the United States Supreme Court has said that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton*, 489 U.S. at 390–91, 109 S.Ct. 1197.

The record is also devoid of any evidence showing that the City adopted with "deliberate indifference" a policy of inadequately training its officers on First Amendment issues. Rather, the record shows that the City implemented its First Amendment Lesson Plan as a part of the settlement to *Lickteig v. Landauer*, a case that also involved individuals preaching the message of the gospel who believed their right to express their religious beliefs were unconstitutionally restricted. The record also shows that the City provides First Amendment training above and beyond what the Commonwealth of Pennsylvania requires. White also fails to provide support that the need for training was "so obvious due to the likely violation of constitutional rights." *Cavicchia*, 2003 WL 22595210, at *13. Thus, the Court finds that Plaintiff has failed to establish independent municipal liability against the City

of Philadelphia. Accordingly, summary judgment is granted in favor of the City as to this Count.

## V. COUNT III: MALICIOUS PROSECUTION

Plaintiff's final claim is that of malicious prosecution against all the Municipal Defendants. As neither Plaintiff nor Municipal Defendants addressed this claim in their briefs, the Court declines to address the issue at this juncture.

## VI. CONCLUSION

For the reasons stated above, the Court denies both Plaintiff's Motion and Municipal Defendants' Cross–Motion for summary judgment as to Count I and Count III. The Court grants summary judgment in favor of the City of Philadelphia as to Count II.

An appropriate Order follows.